GRAHAM WEBB INTERNATIONAL,
Plaintiff,

v.

HELENE CURTIS INCORPORATED,
Defendant.

HELENE CURTIS INCORPORATED,
and Conopco Incorporated,
Counterclaim Plaintiffs,

v.

GRAHAM WEBB INTERNATIONAL,
Counterclaim Defendant.

Civil No. 98–603 (DSD/JMM).

United States District Court,
D. Minnesota.

June 9, 1998.

Alan G. Carlson, Scott W. Johnston and Merchant & Gould, Minneapolis, MN, for Plaintiff.

Alain M. Baudry and Maslon, Edelman, Borman & Brand, Minneapolis, MN, Berj A. Terzian, Peter D. Vogl, Kelly D. Talcott, Maria S. Kratzer and Pennie & Edmonds, New York City, for Defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of plaintiff Graham Webb International for a preliminary injunction. Based on a review of the file, record, and proceedings herein, the court denies plaintiff's motion.

## BACKGROUND

Plaintiff Graham Webb International is a Minnesota Limited Partnership with its principal place of business in Edina, Minnesota.

Defendant Helene Curtis is an Illinois corporation with its principal place of business in Illinois. Counterclaim plaintiff Conopco Incorporated is a New York corporation with its principal place of business in Connecticut. Conopco does business under a number of trade names, including Chesebrough–Pond's USA Company and Helene Curtis,[1] and is itself owned by Unilever United States. *See* Declaration of Kenneth C. Leonard (Docket No. 16) at ¶ 1. The court's jurisdiction is based on 28 U.S.C. §§ 1331, 1332, and 1338, as well as a number of other statutory provisions.

Plaintiff manufactures and sells premium hair care products such as shampoos, conditioners, and styling tools. *See* Declaration of Rick Kornbluth (Docket No. 13) at ¶ 2. In 1989, plaintiff developed a new line of specialty hair care products, called "Intensives," which use heat-activated conditioning and moisturizing agents to treat and restore damaged hair. *Id.* at ¶ 3. Plaintiff alleges that in 1994, it coined the term "ThermaSilk" to be used in connection with some of the products in the "Intensives" line. *Id.* at ¶ 4. Products containing the "ThermaSilk Complex."[2] were first shipped by plaintiff to salons and other "professional" hair care outlets in June of 1995. *Id.* at ¶¶ 5, 9.

Defendants allege that the term "ThermaSilk" was independently created at Chesebrough[3] in the early Fall of 1994, approximately ten months before plaintiff began listing "ThermaSilk Complex" as an ingredient in some of its "Intensives" products. *See* Declaration of Kimberly A. Doyle (Docket No. 19) at ¶¶ 3–6 (detailing development of name through use of focus groups). Chesebrough began extensive testing of this name and associated products in October 1994. Declaration of Gwendolyn Jarrett (Docket No. 21) at ¶¶ 3–5. Such testing, including focus groups, in-home trials, and advertising concept studies, continued for the

---

1. For simplicity, defendant Helene Curtis and counterclaim plaintiff Conopco will be referred to collectively as defendants.

2. The "ThermaSilk Complex" is composed of hydrolyzed silk, panthenol, allantoin, and 1-tetradecanol.

3. In March 1996, Helene Curtis was acquired by Unilever, Chesebrough's corporate parent. All mass merchandise hair care products marketed by Unilever were transferred to Helene Curtis in July 1996. Thus, while "ThermaSilk" products were developed by Chesebrough, Helene Curtis is the plaintiff in this suit.

remainder of 1994 and throughout 1995.[4] *See Id.* at ¶ 5; Declaration of Jacqueline Jodl (Docket No. 22) at ¶¶ 9–13; Declaration of Lori Gertzog (Docket No. 20) at ¶¶ 5–6. Chesebrough sales representatives visited major retail accounts such as Target, K–Mart, and Walgreen's to inform them of the new "ThermaSilk" line. Declaration of Jay Contessa (Docket No. 18) at ¶¶ 3–4. As these efforts predate plaintiff's use of "ThermaSilk" on any of its products, defendants contend that they were the first to use "ThermaSilk" as a trademark for consumer hair products.[5] Plaintiff responds that the focus groups, other product testing, and disclosures to retailers were all conducted pursuant to secrecy agreements, thus negating any inference that defendants were first to openly and notoriously use the "ThermaSilk" mark.

Defendants allege that they conducted due diligence in clearing the "ThermaSilk" mark before using it on any of their products. A trademark search conducted to determine the availability of "ThermaSilk" as a trademark for use with the new hair care products indicated that "ThermaSilk" had been registered as a trademark for silk clothing by Terramar Sports Worldwide (hereafter "Terramar") and that a similar trademark "ThermaSil" had been registered by the Grayson O Company (hereafter "Grayson") for hair care products. Declaration of Kenneth Leonard (Docket No. 16) at ¶ 5. Chesebrough engaged Frank Kelly of the Kelly Pioneer Group to clear Chesebrough's use and registration of "ThermaSilk." Kelly negotiated a consent agreement between Chesebrough and Terramar that permitted "ThermaSilk" to co-exist as the trademark for both companies' products. Declaration of Frank Kelly (Docket

No. 24) at ¶ 15. Through Kelly's efforts, Grayson also assigned all of the rights it held in the trademarks "ThermaSil," "Therma–Sil–Plus," and "ThermaSilk"[6] to Kelly's firm, which in turn assigned them to Chesebrough. Chesebrough then filed applications to register "ThermaSilk" as a trademark for its new hair care products.

Plaintiff alleges that in 1995 Wally Gerhardt from Grayson contacted Gene Martignetti, plaintiff's Vice President and General Manager, and told him that Grayson had a trademark in the term "ThermaSil" for hair care products. Declaration of Gene Martignetti (Docket No. 14) at ¶ 3. This contact was allegedly precipitated by Grayson's President, Van Stamey, seeing plaintiff's products bearing the designation "ThermaSilk" at a trade show in August 1995. Declaration of Van Stamey (Docket No. 23) at ¶ 3. Martignetti avers that he believed that Gerhardt was alleging trademark infringement as leverage to secure for Grayson an exclusive manufacturing and packaging deal for plaintiff's products. Declaration of Gene Martignetti (Docket No. 14) at ¶ 4. Martignetti refused to deal with Grayson, allegedly informing Grayson of his belief that no infringement existed due to the distinct nature of the marks. Plaintiff continued to promote and sell products containing the "ThermaSilk Complex" with no further objections from Grayson. *Id.* at ¶¶ 5–6.

Martignetti later received a call from Kelly, who told Martignetti that his company had acquired the "ThermaSil" mark from Grayson and intended to sell hair care products under the mark.[7] *Id.* at ¶¶ 7, 9. Martignetti avers that Kelly told him of his concern that plaintiff's "ThermaSilk" designation in-

---

4. Such a lengthy development period is apparently not unusual with the introduction of a new product, which often requires one to two years of preparation. Declaration of Jacqueline Jodl (Docket No. 22) at ¶ 14.

5. Not until October 5, 1997, did Helene Curtis present the ThermaSilk brand to its sales force and begin soliciting orders for these products. This is well after the June 1995 launch of plaintiff's products. Defendants are therefore contending that their market research efforts predate the use of "ThermaSilk" by plaintiff and give them priority to the "ThermaSilk" mark.

6. The parties dispute whether Grayson had any rights in the mark "ThermaSilk" which it could assign to anyone.

7. Kelly was calling Martignetti on behalf of Chesebrough, which was seeking more information about plaintiff's use of the "ThermaSilk Therapy" and "ThermaSilk Complex" designations. Declaration of Kenneth Leonard (Docket No. 16) at ¶ 9.

fringed his company's "ThermaSil" mark. *Id.* at ¶ 10. Martignetti believed that Kelly was using a charge of infringement to try to induce plaintiff to sell the "ThermaSilk" mark; however, since plaintiff intended to continue using the "ThermaSilk" mark Martignetti did not return Kelly's phone calls. *Id.* at 11–13; Declaration of Frank Kelly (Docket No. 24) at ¶ 8. On February 6, 1996, Martignetti received a letter from Kelly, indicating that: (1) Kelly's principal had acquired the trademarks "ThermaSilk" and "ThermaSil" from Grayson; (2) his principal intended to use "ThermaSilk" as the product name for hair care products to be sold primarily in retail stores; and (3) Martignetti had indicated that since plaintiff's products were sold to salons only and plaintiff used "ThermaSilk" only as a "secondary type term," the products could co-exist. Letter from Frank Kelly to Gene Martignetti, Exhibit 9 to Declaration of Gene Martignetti (Docket No. 14). Although Martignetti alleges there were errors in the letter, he did not respond. Declaration of Gene Martignetti (Docket No. 14) at ¶ 14. Chesebrough contends that with the assignment from Grayson to Chesebrough, the agreement with Terramar, and the coexistence agreement with plaintiff,[8] "ThermaSilk" was cleared for use and registration. Chesebrough thereafter registered the "ThermaSilk" trademark, and plaintiff did not object to or oppose such registration. Declaration of Kenneth Leonard (Docket No. 16) at ¶ 11. The United States Patent and Trademark Office on April 8, 1998, notified Chesebrough that the "ThermaSilk" mark had been approved for registration.

Plaintiff alleges that in late 1997, its President, Rick Kornbluth, observed an article in *Brandweek* magazine detailing Unilever's plans to introduce a new line of heat-activated hair care products under the name "ThermaSilk." Declaration of Rick Kornbluth (Docket No. 13) at ¶ 13. Like plaintiff's products, defendants' products were to use special ingredients that were activated by the heat of blow dryers, curling items, and other like devices. The article indicated that Unilever was putting some $82 million behind the introduction and that the products were to be shipped to retailers in February of 1998 with advertising to begin the next month. *See* "Unilever Turns up the Heat," Exhibit 6 to Declaration of Rick Kornbluth (Docket No. 13). Plaintiff alleges that it was concerned about the likelihood of consumer confusion because "ThermaSilk" was being used on both companies' products and both used heat-activated ingredients. Declaration of Rick Kornbluth (Docket No. 13) at ¶ 14.

Plaintiff filed this action on February 4, 1998, alleging trademark infringement and related claims against defendant Helene Curtis. A copy of the complaint was sent to Helene Curtis the same day accompanied by a letter requesting that Helene Curtis cease and desist any use of the "ThermaSilk" designation. Letter from Alan Carlson to Ronald Gidwitz, Exhibit 8 to Declaration of Rick Kornbluth (Docket No. 13). Plaintiff also informed Helene Curtis that it intended to seek a temporary restraining order but would wait until February 9, 1998, to begin the preparation of its papers. *Id.* Plaintiff did not seek a temporary restraining order, but instead filed this motion for a preliminary injunction on May 6, 1998.

## DISCUSSION

The court considers four factors in determining whether to grant a plaintiff's motion for preliminary injunction:

1. Is there a substantial threat that the movant will suffer irreparable harm if relief is not granted;

2. Does the irreparable harm to movant outweigh any potential harm that granting a preliminary injunction may cause the nonmoving parties;

3. Is there a substantial probability that the movant will prevail on the merits; and

4. The public interest.

*Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc). The court balances the four factors to

---

**8.** Defendant argues that plaintiff's silence upon receiving Kelly's letter is evidence of their acceptance of a coexistence agreement.

determine whether a preliminary injunction is warranted. *Id.* at 113; *West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). The plaintiff bears the burden of proof concerning the four factors. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987).

### 1. The Threat of Irreparable Harm

■ Plaintiff must first establish that irreparable harm will result without injunctive relief and that such harm will not be compensable by money damages. Possible or speculative harm is not enough. The absence of such a showing alone is sufficient to deny a preliminary injunction. *Gelco,* 811 F.2d at 420; *Roberts v. Van Buren Public Schools,* 731 F.2d 523, 526 (8th Cir.1984).

■ Plaintiff alleges it will suffer irreparable harm if a preliminary injunction is not granted because of the likelihood of confusion among consumers arising from the contemporaneous marketing of the parties' heat-activated hair-care product lines. Citing *Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397 (8th Cir.1987), *cert. denied,* 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988), plaintiff contends that a showing of likelihood of confusion over an infringing trademark establishes irreparable harm. Plaintiff also alleges that damages alone are insufficient compensation for defendants' infringement.

Plaintiff has made no showing of any decreased sales of its "Intensives" line since defendant introduced its "ThermaSilk" line. The only evidence before the court concerning sales of plaintiff's products is the deposition testimony of Heidi Jo Norman, plaintiff's Director of Marketing. Ms. Norman testified that plaintiff had sold $351,000 worth of "ThermaSilk Therapy," one of the "Intensives" products, from 1995 through 1997.[9] Deposition of Heidi Jo Norman, Exhibit D to Declaration of Peter Vogl (Docket No. 17) at 89–90. The court was unable to find any information on the total sales of the other three products in the "Intensives" line that contains "ThermaSilk Complex." Ms. Norman testified, however, that from 1995 to the time of her deposition plaintiff's total sales of all its "Classic" and "Intensives" products totaled between $5 and $6 million. *Id.* at 90. Plaintiff's total sales in 1997 totaled $48 million. *Id.* These numbers indicate that sales from the "Intensives" line, and especially those products containing the "ThermaSilk Complex," compose a very small portion of plaintiff's total revenues. The record is devoid of evidence of any loss of sales of plaintiff's products. Indeed, any decrease in plaintiff's sales resulting from defendants' launch of its "ThermaSilk" line is purely speculative at this time.

In *Mutual of Omaha,* the Eighth Circuit noted in a footnote that:

> [i]n trademark infringement, it is not necessary for plaintiff to prove actual damage or injury to obtain injunctive relief.... Injury is presumed once a likelihood of confusion has been established.... All that the complaining party must do to establish its right to an injunction is to prove the likelihood of confusion.

836 F.2d at 403 n. 11. *See also General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 624 (8th Cir.1987) ("Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [plaintiff] can demonstrate a likelihood of consumer confusion."). However, as detailed below, plaintiff at best has shown that a factual question exists concerning the likelihood that consumers will be confused by the competing products involved in this case and at worst has failed to establish any likelihood of confusion as a result of defendants' alleged infringement. The court therefore concludes that plaintiff will not be irreparably injured absent a preliminary injunction. While this alone is sufficient to deny the injunctive relief sought, the court will also discuss the remaining *Dataphase* factors.

### 2. The Balance of Harm Between the Parties

■ The second *Dataphase* requirement is that the harm to plaintiff in the absence of a preliminary injunction outweighs the poten-

---

9. This number reflects not only sales of single-use packets to individual consumers but also sales of bulk containers used exclusively by stylists.

tial harm that granting a preliminary injunction may cause to defendants. *Dataphase,* 640 F.2d at 114. The essential inquiry in weighing the equities is whether the balance tips decidedly toward the movant. *General Mills,* 824 F.2d at 624.

Here, plaintiff contends that defendants have been using the "ThermaSilk" mark for only a short time. Because defendants will retain the right to sell heat-treated hair care products using a different mark, such as "ThermaSil," plaintiff argues that the balance of harms tips decidedly in its favor.

The court, however, disagrees. Through April 4, 1998, $26.88 million of "ThermaSilk" products have been sold by Helene Curtis. Declaration of Andrew Gross (Docket No. 25) at ¶ 21. In addition, 98 percent of Helene Curtis' retail accounts have accepted all thirteen items in the "ThermaSilk" line. *Id.* To achieve these successful early results, Helene Curtis invested $9.47 million in the development of the "ThermaSilk" line prior to the December 1997 launch and in the first quarter of 1998 spent $21.55 million in promoting the products. *Id.* at ¶¶ 11, 16.

Helene Curtis has expended and will continue to spend substantial sums in the development and promotion of the "ThermaSilk" line in the hopes of realizing substantial profits in the future. The court has been presented with powerful evidence of the substantial negative effect a preliminary injunction will have on revenues from the sale of the "ThermaSilk" line. A preliminary injunction prohibiting the use of the "ThermaSilk" mark on any packaging, advertising, or other materials would force Helene Curtis to recall the "ThermaSilk" line from store shelves.[10] Helene Curtis avers that its retail

customers would expect it to repurchase "ThermaSilk" inventory at an estimated cost of $17.82 million. *Id.* at ¶ 13. While Helene Curtis expected to lose approximately $29.2 million in 1998,[11] a preliminary injunction and the ensuing forced recall would increase this loss to approximately $70.69 million. *Id.* at ¶ 12. Due to the competitive nature of the industry, retailers would immediately fill the shelf space made available by the recall with other competitive products and Helene Curtis would have a difficult time regaining that space. *Id.* at ¶ 15. While Helene Curtis hopes that the "ThermaSilk" line will break even by 1999 and eventually produce total profits of $650.77 million, such returns will be called into question by a preliminary injunction.

Helene Curtis also claims that its relationships with key customers such as Wal–Mart and K–Mart would be damaged, its reputation as a reliable supplier would be irreparably injured, and its ability to bring new products to the market in the future hindered. *Id.* at ¶ 20. While all of these dire consequences may not come to pass, there is certainly substantial evidence that a preliminary injunction would inflict substantial harm on defendants.

In contrast, plaintiff has failed to make a specific showing of the damages it will incur if a preliminary injunction is not granted. Plaintiff makes broad statements of the irreparable harm it will suffer due to the possibility that consumers will confuse the different products. Plaintiff has not, however, proffered any evidence of decreased sales of its own products. Indeed, the possible loss to Helene Curtis of tens of millions of dollars

---

**10.** At oral argument, plaintiff indicated that defendants would not have to recall "ThermaSilk" already on the shelf, but would simply have to use another name for the product line while awaiting trial. Because no recall would be involved, defendants would not lose shelf space and its relationships with retailers would not be threatened. The court, however, agrees with defendants when they argue that they cannot simply change the name of the product. Defendants would have to develop a new name or switch to "ThermaSil," redesign its packaging to reflect this new name and reconceive the promotional and advertising activities related to the brand. Even without a recall, therefore, defendants face

substantial hardship if a preliminary injunction were to be granted. *See* Second Declaration of Andrew Gross (Docket No. 47) (detailing the substantial costs that would be incurred by Helene Curtis if it were required to change name of product from "ThermaSilk" to "ThermaSil," even if no recall of product already on store shelves was required).

**11.** Such early losses are not unusual with the introduction of a new product due to development and high promotional costs. The hope is that substantial revenues in later years more than compensate for any initial losses.

in 1998 and even greater lost profits in future years if a preliminary injunction is granted far outweighs any harm to plaintiff in the absence of such relief.

### 3. The Likelihood of Success on the Merits

■ Under the third *Dataphase* requirement, plaintiff must establish a substantial probability of success on the merits. Because all of plaintiff's claims arise out of the manufacture, promotion, and sale of hair care products by defendants under the "Therma-Silk" mark, the parties have focused their analysis on plaintiff's federal unfair competition claim under Section 43(a) of the Lanham Act. That provision provides that:

(1) any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). In order to prevail on its Lanham Act claim, plaintiff must show both that it has a protectible mark and that defendants' subsequent use of that mark is likely to cause confusion. *See General Mills,* 824 F.2d at 626.

### a. Priority of Use

■ To establish a protectible mark, plaintiff must show that its use of "ThermaSilk" predated any use by defendants. Defendants were notified on April 8, 1998, that the "ThermaSilk" mark had been approved for registration. Plaintiff has never attempted to register the "ThermaSilk" mark, nor did it

oppose plaintiff's registration of the mark. Different courts have noted, however, that "[w]hile federal registration triggers certain substantive and procedural rights, the absence of federal registration does not unleash the mark to public use. The Lanham Act protects unregistered marks as does the common law." *Gilbert/Robinson, Inc. v. Carrie Beverage–Missouri, Inc.,* 989 F.2d 985, 991 (8th Cir.1993), *cert. denied,* 510 U.S. 928, 114 S.Ct. 338, 126 L.Ed.2d 282 (1993) (citing *San Juan Products, Inc. v. San Juan Pools of Kansas, Inc.,* 849 F.2d 468, 474 (10th Cir.1988)). In lieu of registration, a common-law trademark can arise from the adoption and actual use of a word, phrase, logo, or other device used to identify goods or services with a particular party. *First Bank v. First Bank System, Inc.,* 84 F.3d 1040, 1044 (8th Cir.1996). Plaintiff contends that it has a common law trademark arising from its use of the "ThermaSilk" mark prior to defendants' use or registration of the mark.

Plaintiff began selling its "Intensives" line in June 1995. From that date forward, "ThermaSilk" has appeared on the packaging of four items in the "Intensives" line [12] and in promotional materials. Plaintiff points out that defendants affirmed under oath that they first used the "ThermaSilk" mark in commerce on December 22, 1997. Plaintiff therefore claims priority of use and common law ownership of the "ThermaSilk" mark.

Defendants respond that development of the "ThermaSilk" brand began in the Summer of 1994. In the Fall of that year, consumer focus group studies were conducted to measure consumer response to various "ThermaSilk" products and important retail customers were informed that Chesebrough intended to offer "ThermaSilk" products in the near future. Defendants contend that their market research and other pre-launch activities, conducted before plaintiff began selling its "Intensives" line, establishes their priority in using the "ThermaSilk" mark. Citing cases holding that market testing can establish priority of rights in a trademark as long as the use of the trademark is "open and notorious," defendants claim common law

---

12. These four items are "Intensives ThermaSilk Advanced Hair Recovery Treatment," "Intensives Silk Protein," "Intensives Extreme Clean," and "Intensives Total Control."

priority of use. *See* Mem. in Opp'n to Graham Webb's Mot. for Prel. Inj. (Docket No. 15) at 20–21.

 Trademark rights are acquired only by actual use of a mark in commerce in connection with the goods. *See Flavor Corp. of America v. Kemin Industries, Inc.*, 493 F.2d 275, 284 (8th Cir.1974). Plaintiffs contend that defendants' pre-launch activities fall far short of being "open and notorious," as the focus groups, product testing, and customer development activities were conducted in secret. Plaintiff contends that not until December 22, 1997, over two years after plaintiff began selling the "Intensives" line in June 1995, did defendants begin selling "ThermaSilk" products openly.

The court has carefully considered the arguments of both sides and the declarations submitted to the court, and is not prepared at this time to determine which side might have priority of use. Questions exist whether plaintiff has been using "ThermaSilk" as a mark independent from the "Intensives" mark or merely as an identifier of four ingredients composing a hair-care therapy. In addition, fact issues concerning the timing of defendants' pre-launch activities and how many people were aware of the "ThermaSilk" line prior to its formal introduction also exist. These issues are central to who has rights to the "ThermaSilk" mark and which side will eventually succeed on the merits.

**b. Likelihood of Confusion**

 The Eighth Circuit has consistently considered six factors in determining whether a likelihood of confusion exists: (1) the strength of the trademark; (2) the similarity between the parties' marks; (3) the products' competitive proximity; (4) the alleged infringer's intent in adopting the mark; (5) incidents of actual confusion; and (6) the type of product, its cost, the conditions of purchase, and the degree of care to be exercised by potential customers of the trademark holder. *General Mills*, 824 F.2d at 626; *Mutual of Omaha*, 836 F.2d at 399; *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980). No single factor is dispositive. *See Mutual of Omaha*, 836 F.2d at 399 n. 3 ("These are not necessarily the only factors that might be relevant in a particular case. The ultimate inquiry always is whether, under all the circumstances, there exists a likelihood of confusion between the plaintiff's trademark and the allegedly infringing use."). The court will briefly examine each of the forementioned six factors.

**1. Strength of Trademark**

Whether a mark is entitled to protection is initially approached by categorizing the mark as generic, descriptive, suggestive, or arbitrary. *General Mills*, 824 F.2d at 625. These terms have specific meanings and a mark is entitled to varying protection depending on its classification:

> A mark is designated as generic in recognition of its role in consumer minds as the common descriptive name for a type, genus, or class of goods, ... and such a mark is precluded from trademark protection under any circumstances.... A descriptive mark, on the other hand, designates characteristics, qualities, effects or other features of a product and can be protected only if shown to have become distinctive through acquiring secondary meaning.... Suggestive marks, requiring imagination to reach a conclusion as to the product's nature, and arbitrary marks, which are inherently distinctive, are entitled to broad trademark protection without establishing secondary meaning.

*Id.* (citations omitted). *See also Duluth News–Tribune, a Div. of Northwest Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir.1996) (defining generic, descriptive, suggestive, and arbitrary marks). The court may also consider the degree of consumer awareness of the mark and the use of the mark on similar goods.

Plaintiff claims "ThermaSilk" is a strong and distinctive mark, suggestive or arbitrary in nature, that is entitled to broad protection. Plaintiff contends the term "ThermaSilk" has no independent meaning and the mark as a whole requires imagination to draw any conclusions about the nature of the product. Defendant argues in response that plaintiff uses "ThermaSilk" merely as a descriptor of ingredients contained in a few of the plain-

tiff's "Intensive" products and plaintiff's failure to use a " ™ " symbol next to the word "ThermaSilk" on its products and promotional materials evidences plaintiff's lack of intention to use the term "ThermaSilk" as a trademark to identify the source of its product.

▉ While the court agrees that the term "ThermaSilk" does require some imagination to reach a conclusion as to the product's nature, it is more descriptive than suggestive. A descriptive mark designates characteristics, qualities, effects or other features of a product. The packaging for plaintiff's "Intensives ThermaSilk Therapy Advanced Hair Recovery Treatment" indicates that the product is "fortified with ThermaSilk Complex." Exhibit 2 to Declaration of Rick Kornbluth (Docket No. 13). The term "ThermaSilk" is being used to describe a treatment which does good things for damaged hair. Three other products in the "Intensives" line also list "ThermaSilk" as an ingredient. This is further evidence that plaintiff uses the term to describe the product. Indeed, the "Intensives" mark is the suggestive mark in this case, not "ThermaSilk."

▉ A descriptive trademark may still receive legal protection if the mark has an accepted secondary meaning. "Secondary meaning refers to a mark that 'has become distinctive of the applicant's goods in commerce, i.e., to a mark that consumers associate with a producer or distributor rather than with the product itself.'" *Cellular Sales, Inc. v. Mackay,* 942 F.2d 483, 486 (8th Cir.1991) (citing *Best Buy Warehouse v. Best Buy Co., Inc.,* 920 F.2d 536, 537 (8th Cir. 1990) (McMillan, dissenting), *cert. denied,* 501 U.S. 1252, 111 S.Ct. 2893, 115 L.Ed.2d 1058 (1991)). *See also First Bank,* 84 F.3d at 1045 ("A trademark user establishes secondary meaning by showing that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others.") (quotations and citations omitted); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1330 (8th Cir.1985) ("To establish secondary meaning, the user must show that the mark or symbol by long and exclusive use and advertising in the sale of [the user's] goods has become so associated in the public mind with such goods that it serves to identify them and distinguish them from the goods of others.") (quotations and citations omitted). Courts will accept direct evidence of consumer confusion or evidence from consumer surveys as evidence that a mark has acquired secondary meaning. *Best Buy Warehouse,* 920 F.2d at 537. The court finds that at best a fact issue exists concerning whether the "ThermaSilk" mark has come to differentiate plaintiff's goods in commerce. While the court could find that the name "Graham Webb" or the product line "Intensives" create in consumers' minds an association between plaintiff and its products, it is much less likely that "ThermaSilk" has the same effect.

In addition, the court notes that plaintiff uses the " ™ " symbol next to the term "Intensives" on the back of its "ThermaSilk Therapy Advanced Hair Recovery Treatment" and the three other products containing "ThermaSilk Complex." Plaintiff also uses the " ™ " and " ® " in connection with the packaging of a number of its other products. *See* Exhibit 2 to Declaration of Peter Vogl (Docket No. 17) at 20–22 (demonstrating that plaintiff uses the " ™ " symbol in connection its "Bodacious" and "IceCap" products and the " ® " symbol in connection with the terms "ThermaCore," "ThermaClay," "Magnitude," and "Energy Lock."). Plaintiff therefore uses these symbols next to those terms it considers to be trademarks. The fact that plaintiff has decided not to use the " ™ " symbol next to the term "ThermaSilk" is evidence that the term is being used as a descriptor rather than a trademark. Ms. Norman testified that she felt registering "ThermaSilk" was not necessary because common law rights were just as valuable and the " ® " and " ™ " symbols cluttered commercial copy. Deposition of Heide Jo Norman, Exhibit 13 to Declaration of Scott Johnson (Docket No. 30) at 11, 13. Plaintiff made a business decision not to register "ThermaSilk" or otherwise indicate an interest in the

mark, and must now deal with the negative inferences that can be made from such decision.

### 2. Similarity Between Marks

Plaintiff contends that both plaintiff and defendant not only use the identical mark, but also depict it in the same manner, as one word with a capital "T" and capital "S," thus suggesting a likelihood of confusion. Defendants respond that their presentation of "ThermaSilk" is completely distinguishable from plaintiff's use of the word in connection with its "Intensives" line. The court has examined both parties' products, and agrees that the marks are easily distinguishable.

Defendants' product displays "THERMA-SILK" in all capital letters underneath a multicolor design and immediately above the house name "Helene Curtis" on the front-center of the packaging. Plaintiff's product, on the other hand, lists the Graham Webb logo at the top of the package, followed by "INTENSIVES" in all capital letters. Only on the packaging for "ThermaSilk Therapy" does "ThermaSilk" appear on the front of the packaging, where it is listed third, in smaller type than either the Graham Webb logo or "Intensives." [13] In addition, the "Intensives" products come in packaging that is cobalt blue with creme or blue caps and the "ThermaSilk" products come in champagne colored bottles. These differences all lessen the likelihood of consumer confusion.

### 3. Products' Competitive Proximity

Courts within the Eighth Circuit have considered the target group of purchasers in determining whether consumer confusion is likely. See U.S. Jaycees v. Commodities Magazine, Inc., 661 F.Supp. 1360, 1363 (N.D.Iowa 1987). In this case, the parties do not sell their products through the same channels, thus decreasing the likelihood of consumer confusion. Plaintiff sells its product only through professional salons. As the "Intensives" packaging itself states, "We can only guarantee the authenticity of this product if purchased at a professional beauty salon." Exhibit 2 to Declaration of Rick Kornbluth (Docket No. 13). Defendants sell their product through retail, discount, and grocery outlets. Plaintiff's product is not available in these locations, just as defendants' product is not likely to be found in salons. See A–Veda Corp. v. Aura Inc., 19 U.S.P.Q.2d 1864, 1867 (D.Minn.1991) (finding, in trade dress action, that where one party targets professional hair salons while the other targets retail beauty supply stores the likelihood of confusion is reduced); La Dove, Inc. v. Playtex Jhirmack, Inc., 19 U.S.P.Q.2d 1149, 1152 (S.D.Fla.1991) (finding little likelihood of confusion where plaintiff's full line of hair care products was sold only to salons and defendant's line was sold through mass merchandisers); Scott v. Mego Intern., Inc., 519 F.Supp. 1118, 1132 (D.Minn.1981) (no likelihood of confusion where figurines sold in toy stores and hobby stores).

### 4. Defendants' Intent

In their answer, defendants admit that "certain Helene Curtis employees were aware Graham Webb was using the term 'Thermasilk' to describe an ingredient contained within certain of its products sold under the trademark INTENSIVES." Answer and Counterclaims (Docket No. 3) at ¶ 12. Plaintiff contends that because defendants introduced their "ThermaSilk" line after knowing of plaintiff's use of the identical term and after unsuccessfully attempting to clear the mark through the efforts of Frank Kelly the court should make an inference of bad faith.

The evidence, however, shows that "ThermaSilk" was coined independently by Chesebrough's marketing department in the Fall of 1994, well before plaintiff began selling its "Intensives" product line in June 1995; therefore, Chesebrough did not "steal" the name from plaintiff. There is also evidence that Chesebrough conducted an adequate investigation of the availability of "ThermaSilk" for use on its products. At this point in the proceedings, therefore, the court cannot find that defendants acted in bad faith in launching their ThermaSilk line.

---

**13.** The word "ThermaSilk" appears only on the back of the packaging of the other three products in the "Intensives" line which contain "ThermaSilk Complex."

### 5. Incidents of Actual Confusion

In an effort to demonstrate consumer confusion between the two products, plaintiff commissioned a survey entitled "Hair Care Products Using 'Thermasilk' in Their Names—A Survey of Likelihood of Consumer Confusion in Three U.S. Metropolitan Areas." *See* Declaration of Robert Sorensen (Docket No. 33) at ¶ 2. As part of this survey, 200 women in three cities were intercepted at shopping malls and

> were shown a package of Graham Webb Intensives Thermasilk Therapy product and a bottle of the Helene Curtis Thermasilk conditioner product, each while the other was concealed, and were asked whether the two products (without mention of their names) were put out by two different companies or by the same company. Moreover, they were asked, in the instance when they answered two different companies, whether or not they agreed or disagreed with each of eight (8) statements intended to reveal the presence or absence in respondents' minds about relationships, if any, between the two companies making said products.

*Id.* at ¶ 8. According to Robert C. Sorensen, who designed the survey, the results indicate:

> a strong likelihood of source confusion in that a substantial percentage of relevant consumers believes that the two competing Graham Webb and Helene Curtis hair care products with "Thermasilk" in their respective names are put out by the same company rather than by two different companies. Moreover, more than half again as many additional consumers from this same population perceive a business relationship between the sources of these same two products.

*Id.* at ¶ 9.

Defendants, however, contend that Dr. Sorensen's survey has yielded a false picture of the marketplace due to numerous methodological flaws in the survey's design and implementation. Defendants argue that the survey's flawed design has produced biased results supporting plaintiff's claim of alleged confusion. The alleged flaws include: (1) a narrowly defined and unrepresentative sample of respondents consisting solely of women who purchased or thought about purchasing hair care products in salon and beauty shops and excluding any women who only purchased or thought about purchasing hair care products in mass merchandise outlets; (2) omission of distributors, who are not likely to be confused; (3) the inability to project the survey results to a wider population due to the fact that it is a non-probability study; (4) failure to use non-leading questions; and (5) failure to verify the survey data.[14] In fact, Dr. Jacob Jacoby, defendants' expert, has criticized almost every aspect of Dr. Sorensen's survey.

Plaintiff, pointing to cases where courts have refused to consider Dr. Jacoby's opinion because he did not conduct his own survey, criticizes Dr. Jacoby's opinions. *See* Pl.'s Surreply Mem. in Supp. of its Mot. for a Prelim. Inj. (Docket No. ___) at 4–5. The court notes, however, that Dr. Jacoby, unlike Dr. Sorensen, is not rendering an opinion on the likelihood of confusion of consumers, but instead is opining on the methodological integrity of Dr. Sorensen's survey. While plaintiff attempts to rebut Dr. Jacoby's criticisms, the court is not convinced that the confusion evidenced in Dr. Sorensen's survey is a true indicator of market conditions. The court, at this preliminary stage of the proceedings, is not in a position to determine how much confusion among brands exists in consumers' minds nor to resolve the cross-criticisms of the parties' experts. Given the potential that Dr. Sorensen's results are not a true indicator of consumer confusion, the court is not prepared to find a level of confusion adequate to justify a preliminary injunction.

### 6. Other Considerations

Finally, the court will consider such factors as the type of product involved, its cost, the conditions of purchase, and the degree of

---

**14.** Defendants also point to Dr. Sorensen's failure to survey Midwest consumers, and failure to use third party products as a control.

care to be exercised by potential customers in making their purchasing decision. Plaintiff contends that the products "are fairly inexpensive hair care products that are often purchased on impulse by individuals at all levels of sophistication." Pl.'s Mem. in Supp. or Mot. for Prelim. Inj. (Docket No. 12) at 12–13. Because little customer care is exercised due to the nature and price of the product, plaintiff argues the likelihood of consumer confusion is high.

Several other courts have concluded that purchasers of expensive hair and beauty aids are sophisticated buyers who exercise care in their purchasing decisions, thus reducing the likelihood of confusion. *See A–Veda Corp.,* 19 U.S.P.Q.2d at 1867 ("[T]he typical consumer of Aveda products is a well-informed, careful buyer. Aveda products are relatively expensive and sold primarily in professional hair salons. Thus, casual 'off the shelf' purchases are probably not the norm. This further reduces the likelihood of confusion."); *P.F. Cosmetique, S.A. v. Minnetonka, Inc.,* 605 F.Supp. 662, 671 (S.D.N.Y.1985) ("[T]he proof ... tends to show that those who purchase top-of-the-line premium priced prestige beauty aid products can and do differentiate among packages with a number of common elements."). The court agrees, and finds that purchasers of plaintiff's products exercise sufficient care in their buying decisions to negate the probability that they would purchase defendants' products inadvertently.

In conclusion, the court finds that questions of fact surround which party was first to use the "ThermaSilk" mark. Even if plaintiff was first to use the mark, however, the court finds that at this stage of the proceedings plaintiff has failed to show a sufficient likelihood of confusion among consumers to justify a preliminary injunction.

**4. The Public Interest**

The final *Dataphase* factor requires the court to consider the public interest. *Dataphase,* 640 F.2d at 114. Not surprisingly, both sides contend that the public interest supports their position. Plaintiff contends the public interest would be served by a preliminary injunction because undue confusion among purchasers of hair care products would be avoided. Plaintiff also points to more general interests of deterring trademark infringement and protecting the trademark rights of smaller companies. Defendants, on the other hand, contend that a preliminary injunction would irreparably harm the "ThermaSilk" brand, thereby depriving consumers of an innovative and competitively priced product.

If this were a clear-cut case of infringement the court would be more likely to find the public interest favors plaintiff. Because factual questions surround which party was first to use the "ThermaSilk" mark and whether confusion among the purchasing public exists, however, defendants' argument is more persuasive. The public interest is served in this case by allowing continued competition between the products until after a full adjudication of the issues involved.

In sum, the court notes that the primary purpose of a preliminary injunction is to preserve the status quo until the court reaches the case's merits and can grant full, effective relief if warranted. *National Basketball Ass'n v. Minnesota Professional Basketball, Ltd. Partnership,* 56 F.3d 866, 872 (8th Cir. 1995). Denial of plaintiff's motion preserves the status quo. Granting preliminary relief in this case would do exactly the opposite, causing the removal of defendants' "ThermaSilk" products from store shelves and causing the possibility of irreparable harm before the court is able to reach the case's merits.

**CONCLUSION**

Based on a review of the file, record, and proceedings herein, the court finds that plaintiff has failed to satisfy its burden as to the four *Dataphase* factors and, accordingly, **IT IS HEREBY ORDERED** that plaintiff's motion for a preliminary injunction is denied.