**SHADE'S LANDING, INC., Plaintiff,**

v.

**James C. WILLIAMS, Defendant.**

**No. Civ. 99–738(JRT/FLN).**

United States District Court,
D. Minnesota.

Dec. 22, 1999.

James T. Nikolai, Nikolai, Mersereau & Dietz, Minneapolis, MN, for plaintiff.

Michael R. Gray, Mackall, Crounse & Moore, Minneapolis, MN, for defendant.

## MEMORANDUM OPINION AND OR-DER DENYING MOTION FOR PRE-LIMINARY INJUNCTION

TUNHEIM, District Judge.

Plaintiff Shade's Landing, Inc. brings this action against defendant James C. Williams alleging trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44. Plaintiff's allegations arise from defendant's use of an Internet web domain name that is similar to a domain name used by plaintiff. This matter is before the Court on plaintiff's motion for a preliminary injunction prohibiting defendant from continuing to use the domain name during the pendency of this case.

## BACKGROUND

Plaintiff is a corporation engaged in the business of providing computer-based services related to the real estate industry. As one of its services, plaintiff sponsors an Internet web site under the domain name "Home–Market.com." [1] This web site is targeted at home owners and offers a variety of referral services, including referrals to real estate agents, mortgage brokers, landscaping services, insurance companies, home improvement services, and moving and relocation services. Plaintiff also sponsors an Internet radio program under the name "Home–Market" that relates to the same kinds of services as those advertised through the referral network. Plaintiff registered the Home–Market.com domain name with Network Solutions in May 1996, and issued a press release announcing the web site referral network that same month. The press release targeted businesses in the real estate industry, offering them registration in the referral network to be accessed by consumers through the Home–Market.com web page.

The Home–Market.com referral network constitutes only a small portion of plaintiff's business. The primary focus of plaintiff's business is on web site development services for real estate agents. Plaintiff advertises its web site development services, as well as general graphic design and Internet consulting services, through an Internet web site under the domain name "ShadesLanding.com." The Shades-Landing.com web site is entirely separate from the Home–Market.com web site, and is targeted at businesses in the real estate industry rather than consumers. Many of the commercial clients for whom plaintiff has developed web pages also are registered in plaintiff's referral network for consumers. As a result, the Home–Market.com web site contains links to some of the web pages that plaintiff has developed for real estate agents.

Plaintiff markets its web site development services on a national scale. According to information found at the Shades-Landing.com web site plaintiff has a policy of accepting only ten clients per state from a given industry. The ShadesLanding web site indicates that at this time plaintiff's services are closed to new clients operating as real estate agents in the State of Minnesota.

Sometime in 1998 defendant began operating a business out of his home that provides web site development services for real estate agents in the Minneapolis and St. Paul, Minnesota metropolitan area. Defendant sponsors a web site under the domain name "Home–Market.net" in connection with this business. Defendant principally uses this domain name as a host for all of the individual web sites that he develops for his clients. As a result, "Home–Market.net" forms the first segment of the individual client web page domain names, followed by a more specific name designating the particular client. Thus, a web site developed by defendant for real estate agent Jane Doe might be found at "Home–Market.net/JDoe." Defendant's clients promote the sites defendant has developed for them by printing their individualized "Home–Market.net" domain names on business cards, letterhead, signs, and other forms of advertising.

The Home–Market.net web page itself contains little useful information. As originally designed, it contained only a counter indicating the number of times Internet users have accessed that web site. Sometime during the pendency of this litigation defendant also added to the site a solicitation form targeted at real estate agents. It stated that Home–Market.net was a real estate agent web site development service, and permitted realtors to submit their names, addresses and telephone numbers on a short form if interested in obtaining more information about defendant's ser-

---

**1.** For an informative review of how the Internet functions, the role of domain names, and other basic terminology related to the Inter-

net, see *Brookfield Communications v. West Coast Entertainment*, 174 F.3d 1036, 1044–45 (9th Cir. 1999).

vices. Defendant voluntarily agreed to remove the solicitation form from the Home–Market.net web site pending the outcome of the preliminary injunction hearing on this matter in order to maintain the status quo and circumvent plaintiff's threat to obtain a temporary restraining order. At this time the web site therefore consists only of a counter.

Plaintiff asserts that by using a domain name similar to Home–Market.com, defendant has created a likelihood of confusion about the source of his services and is attempting to misdirect plaintiff's clients. As evidence of such confusion, plaintiff states that in September 1999 one of defendant's clients accidentally sent it an email intended for defendant, directing the message to Home–Market.com rather than Home–Market.net. Plaintiff points to no other known incidents of confusion between the two names.

## ANALYSIS

██ In evaluating whether to grant a motion for a preliminary injunction courts balance the factors set forth in *Dataphase Sys., Inc. v. CL Sys., Inc.*, including "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." 640 F.2d 109, 113 (8th Cir.1981). The likelihood of success on the merits is not, alone, determinative. *See id.* Rather, a court must be flexible enough to consider the particular circumstances of each case and keep in mind that, "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* If the threat of irreparable harm to the movant is slight when compared to the likely injury to the other party, the movant carries a particularly heavy burden of showing a likelihood of success on the merits. *See id.* A court may not issue a preliminary injunction without finding that some possibility of irreparable harm to the movant exists. *See id.* at 114 n. 9.

## I. Probability of Success on the Merits

██ Plaintiff concedes that at all times relevant to these proceedings it did not have a registered trademark in the domain name "Home–Market.com," claiming instead that it has a trademark in that name under the common law. Under these circumstances, plaintiff is not entitled to a statutory presumption that its purported trademark is valid. *See* 15 U.S.C. § 1115(a) (providing that trademark registration constitutes prima facie evidence of the mark's validity). Thus, in order to prove its infringement claim under the Lanham Act[2] at trial, plaintiff must demonstrate that it actually had a protected common law trademark in the name "Home–Market.com," that this mark is sufficiently similar to defendant's mark to create a substantial likelihood of confusion among consumers, and that "the court's exercise of equitable power is appropriate." *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044 (8th Cir.1996).

### A. Validity of the purported trademark

██ A common law trademark qualifies for protection under the Lanham Act only if it is distinctive in the minds of consumers. *See id.* at 1045; *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir.1985). In considering whether a particular mark is distinctive courts classify it into one of four categories, including marks that are: "(1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *First Bank*, 84 F.3d at 1045; *Co–Rect*, 780 F.2d at 1329.

**2.** The parties make no distinction between the Lanham Act and the MDTPA in their supporting memoranda, addressing plaintiff's claims together under the Lanham Act and the judicial opinions interpreting it. The Court accordingly addresses plaintiff's motion under the Lanham Act.

■ A generic mark refers to the article or service it identifies by its common name and is not entitled to protection. *See Co–Rect,* 780 F.2d at 1329. Descriptive marks are slightly more distinctive than generic marks. They describe the "characteristics, qualities, effects, or other features" of the marked product. *Id.* Suggestive marks are deemed inherently distinctive. *See id.* They suggest some quality or ingredient of the product but require a leap of imagination in order for the consumer to reach a conclusion regarding the nature of the goods. *See id.; see also First Bank,* 84 F.3d at 1045 n. 5. Arbitrary or fanciful trademarks are also inherently distinctive. They include common marks that are applied to the product in an entirely unfamiliar way, and marks invented solely for their use as trademarks. *See Insty*Bit, Inc. v. Poly-Tech Indus., Inc.,* 95 F.3d 663, 673 n. 10 (8th Cir.1996).

■ Unlike suggestive and arbitrary or fanciful marks, descriptive marks are not deemed inherently distinctive. For this reason, they are entitled to protection only if the mark users demonstrate that they have become distinctive by acquiring a secondary meaning in the minds of consumers. *See Co–Rect,* 780 F.2d at 1329; *First Bank,* 84 F.3d at 1045. Secondary meaning indicates that through "long and exclusive use and advertising in the sale of the user's goods, [the mark] has become so associated in the public mind with such goods that it serves to identify the source of the goods and to distinguish them from the goods of others." *Co–Rect,* 780 F.2d at 1330 (citations omitted) (alterations omitted). The key factor is whether "in the consumer's mind the mark denotes a single thing coming from a single source." *Id.* (citations omitted) (internal quotations omitted).

■ The parties predictably differ on the issue of how "Home–Market.com" should be categorized. Plaintiff concedes that it is not arbitrary or fanciful but argues that it is suggestive. Defendant concedes that it is not generic but argues that it is descriptive, and therefore, plain-tiff must demonstrate that it has acquired a secondary meaning in order to claim protection under the Lanham Act. The line between what constitutes a descriptive mark and what constitutes a suggestive mark is not altogether clear, and ultimately the correct categorization of a particular mark is a question of fact. *Anheuser–Busch, Inc. v. Stroh Brewery Co.,* 750 F.2d 631, 635 (8th Cir.1984). Courts wrestling with this distinction have arrived at varied and seemingly inconsistent results. *Compare id.* at 633 (affirming district court's finding that "LA" is suggestive when used to designate low alcohol beer), *Dietene Co. v. Dietrim Co.,* 225 F.2d 239, 243 (8th Cir.1955) (finding term "Dietene" more suggestive than descriptive when used to designate a food supplement for people on a reducing diet), *and American Home Prods. Corp. v. Johnson Chemical Co., Inc.,* 589 F.2d 103, 106 (2nd Cir.1978) (deeming "roach motel" to be suggestive rather than descriptive), *with Duluth News–Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1096 (8th Cir.1996) (finding "Duluth News–Tribune" to be a descriptive term when used to designate a newspaper published in Duluth, Minnesota), *First Bank,* 84 F.3d at 1045 (adopting parties' concession that "First Bank" is descriptive), *ConAgra, Inc. v. Geo. A. Hormel, & Co.,* 990 F.2d 368, 370 (8th Cir. 1993) (affirming district court's determination that "Healthy Choice" is a descriptive rather than suggestive term when used to identify food products), *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 625 (8th Cir.1987) (affirming district court's determination that "Apple Raisin Crisp" is descriptive rather than suggestive), *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.,* 747 F.2d 81, 87–88 (2nd Cir.1984) (finding the phrase "Cozy–Warm ENERGY SAVERS" to be descriptive when used to identify women's pajamas), *and Graham Webb Int'l v. Helene Curtis, Inc.,* 17 F.Supp.2d 919, 928 (D.Minn.1998) (finding "ThermaSilk" to be descriptive when used to designate a line of hair care products).

■ Because each case presents its own unique set of circumstances a review of these precedents, although marginally helpful, is not determinative. Due to the imprecise nature of this inquiry, courts have employed a number of tests to distinguish suggestive marks from distinctive ones. The most common of these is the "imagination" test, which provides: "If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness." *ConAgra, Inc. v. Geo. A. Hormel & Co.*, 784 F.Supp. 700, 708 (D.Neb.1992) (quoting 1 J. McCarthy, Trademarks and Unfair Competition § 11:21, at 492), *aff'd, ConAgra*, 990 F.2d at 370. Nevertheless, the mark itself need not immediately bring to mind the nature of the product it identifies, rather "the question is whether the term 'directly and clearly conveys information about the ingredients, qualities or characteristics of the product or service.'" *Id.* (quoting 1 J. McCarthy, Trademarks and Unfair Competition § 11:21, at 491).

■ Under this test the Court finds that "Home–Market.com" is a descriptive term. Although the precise nature of plaintiff's business is not apparent from this language, it directly and clearly conveys the general nature of the services it identifies. The term "Home" describes services related to homes, "Market" indicates that the services are available to consumers, and ".com" is a well-known top-level domain name indicating that the services are available through the Internet. *See Brookfield*, 174 F.3d at 1044. Because plaintiff's web-site referral network markets services related to homes over the Internet, it can be stated fairly that the mental leap between the words "Home–Market.com" and the general attributes of the service it identifies is almost instantaneous.

■ Because plaintiff seeks to protect an unregistered mark falling into the descriptive category, it has the burden of demonstrating that this mark has acquired a secondary meaning. On the present record the Court finds precious little evidence that it has. Indeed, plaintiff fails even to argue that the mark has acquired a secondary meaning in its memoranda in support of the preliminary injunction motion. Nonetheless the preliminary injunction hearing plaintiff's counsel argued as evidence of secondary meaning that plaintiff's web-site appears as the first listing in a search through most Internet search engines under the term "Home–Market." Defendant's affidavit supports this contention. Plaintiff's counsel also represented that Internet users accessed the "Home–Market.com" web site at least 1,500 times during an unidentified two week period of time. Counsel failed to identify any documents in the record supporting this representation. Nevertheless, even assuming it to be true, these facts alone are not a sufficient basis upon which to find that "Home–Market.com" has become "so associated in the public mind" with plaintiff's services at that site that it distinguishes them from other services and identifies them as coming from a "single source." *Co–Rect*, 780 F.2d at 1330.

The high placement of plaintiff's web site in search engine listings shows that plaintiff has gone to great lengths to register it with search engine providers and to use effective metatags [3] so that consumers searching for the key phrase "Home–Market" can find it easily. It does not show, however, that many consumers have actually found or searched for plaintiff's services using that phrase such that it has become associated with plaintiff's web site in the public mind. *See Co–Rect*, 780 F.2d at 1332 ("Although it is true that advertis-

---

**3.** Metatags consist of computer code associated with a particular web site and are intended to describe its contents. "The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be 'hit' in a search for that keyword and the higher on the list of 'hits' the web page will appear." *Brookfield*, 174 F.3d at 1045 (explaining the operation of Internet search engines and the function of metatags in connection with them).

ing is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the effect of such advertising that is important, not its extent."). Moreover, although plaintiff claims that at least 1,500 people accessed the Home–Market.com web site over a two week period, plaintiff does not indicate whether this two week period occurred before or after defendant began using the Home–Market.net web site. This evidence therefore fails to show that plaintiff's web site acquired a secondary meaning before defendant's alleged infringement began. Furthermore, the record also reflects that more than 183,000 people accessed defendant's web site from the date of its inception sometime in 1998 through September 7, 1999. This represents a period of 88 weeks at most, for a total of over 4,100 incidents per two week period. Plaintiff's evidence thus does not demonstrate that the public's association of the phrase "Home–Market" with its services is presently any stronger than its association of that phrase with defendant's services. Finally, aside from plaintiff's initial press release announcing the Home–Market.com referral network, it has not marketed the web site through any other medium outside the Internet during the three years that the site has been in operation. For these reasons, the Court finds the evidence on the record developed thus far insufficient to conclude that "Home–Market.com" has acquired a secondary meaning.[4] The Court is thus unpersuaded that plaintiff seeks to protect a valid trademark, and accordingly finds that plaintiff has not shown a probability of success on the merits.

**B. Likelihood of confusion**

Even assuming that plaintiff has established ownership in a protectable trademark, it has not shown a strong probability of proving the second element of its prima facie case at trial. Once a mark user demonstrates that its mark is entitled

to protection, it must establish that the alleged infringer's use actually confuses or creates a substantial likelihood of confusion among consumers as to the source of the product or service at issue. *See Co–Rect*, 780 F.2d at 1330.

■ In determining whether an alleged infringer's use creates a likelihood of confusion, courts consider the following factors: (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase. *See id.*, citing *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980).

■ Upon reviewing the evidence, the Court finds that only the second factor weighs strongly in favor of plaintiff. The parties' domain names are identical with the exception of the ".com" and ".net" suffixes attached to them. These suffixes constitute two of the six standard top-level domain names, one of which is attached to all Internet web addresses. *See Brookfield*, 174 F.3d at 1044 (stating that the available top-level domain names include: " '.com' (commercial), '.edu' (educational), '.org' (non-profit and miscellaneous organizations), '.gov' (government), '.net' (networking provider), and '.mil' (military)."). Because all domain names include one of these extensions, the distinction between a domain name ending with ".com" and the same name ending with ".net" is not highly significant. The Court accordingly concludes that plaintiff's mark and defendant's mark are quite similar.

Other factors, however, weigh in favor of defendant. For the above reasons, plaintiff has not shown that its mark is a strong one in the minds of consumers. Moreover,

---

4. The Court also notes that plaintiff has produced no consumer surveys or other direct evidence to demonstrate that its mark has acquired a secondary meaning. *See Co–Rect,*

780 F.2d at 1333 n. 9 (discussing the importance of consumer surveys in establishing secondary meaning).

none of the evidence suggests that defendant had an intent to deceive consumers into thinking that his services were those of plaintiff. There is no evidence that defendant even had knowledge of plaintiff's web site or the nature of its services before he began using the "Home–Market.net" address. Furthermore, plaintiff submits only the barest evidence of actual confusion, including the fact that one of defendant's clients accidently sent an email intended for defendant to plaintiff's address. This incident resulted in no loss of business to plaintiff, and it does not appear that defendant's client was ever genuinely confused about the identity of the intended recipient of his message. The record contains no evidence of any consumer who began doing business with defendant in the mistaken belief that defendant sponsors the referral network available at Home–Market.com. The isolated misdirected email to which plaintiff refers is insufficient to establish that actual confusion between the parties' services has occurred.

The remaining two factors do not appear to weigh strongly in favor of either party. The parties are in competition with each other in the general sense that both offer advertising on the Internet to real estate agents, and in the more specific sense that both are engaged in web page development for real estate agents. The strength of this factor is weakened, however, by the fact that plaintiff does not market its web page development services through the Home–Market.com site, but rather, through its site at ShadesLanding.com. An Internet user who accesses the Home–Market.com web site thus would not know from doing so that plaintiff offers commercial web page development. Furthermore, according to plaintiff's policy of accepting only ten clients per state, it does not presently accept clients from Minnesota—the only geographic area in which defendant markets his services. Plaintiff contends that at some point in the future it intends to begin accepting real estate agent clients from that area again. Nevertheless, it is clear that the current level of direct competition between the parties is minimal.

The parties' services are for these reasons sufficiently similar to put them in competition with each other, but the degree of direct competition shown on this record is not high.

Finally, *SquirtCo* advises courts to consider the kind of product or service at issue along with its cost and conditions of purchase with regard to "whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist." 628 F.2d at 1091. The extent to which an Internet user might avoid confusion between the parties' web sites is likely to vary significantly depending on his or her level of sophistication and knowledge of how the Internet works. Neither party has submitted substantial evidence or argument addressing this factor, and the Court finds that it is not significantly weighted in either direction.

Viewing the above factors in totality, the Court finds that although the record as it is currently developed demonstrates a possibility of consumer confusion between the parties' services, this possibility is not so strong that it constitutes a "substantial likelihood" of confusion. For these reasons, and because the Court has found insufficient evidence of a valid trademark, plaintiff has not demonstrated a probability of success on the merits.

## II. Threat of Irreparable Harm to the Movant

Given the relatively low level of direct competition between the parties and the paucity of evidence of actual confusion, the threat of irreparable harm to plaintiff resulting from defendant's use of the Home–Market.net web site appears to be slight. Although the possibility exists that a realtor could associate defendant's referral network and web site development services with plaintiff's business because of the similarity in domain names, plaintiff has not shown that anyone has done so.

The potential for such confusion to arise is particularly low in light of the fact that

defendant uses the "Home–Market.net" web site primarily as an inactive host for the web pages that he develops for his clients. This status quo is obviously subject to change. In the absence of a preliminary injunction defendant might replace the solicitation form that he removed in light of this litigation or commence marketing through the web site in some other way. Nevertheless, the possibility that plaintiff's goodwill would be damaged or its clients misdirected as a result of such changes is minimal, because plaintiff markets the majority of its services through the ShadesLanding.com site.

### III. Balance of Harms

Against this slight threat of harm the Court must weigh the substantial harm that defendant is certain to experience if the Court grants the requested injunction. Defendant avers that he presently has fifty-five clients who are real estate agents practicing in the Minneapolis area. He further avers that each of these clients has created letterhead, business cards, lawn signs, and promotional brochures listing "Home–Market.net" as the first part of his or her web site address. Requiring defendant to change his domain name would not only force all of defendant's clients to reprint their marketing materials, but also might temporarily cause them to lose business during the transition from one domain name to another. The potential impact that these losses might have on defendant, through loss of goodwill with his existing clients, is substantial. These injuries to defendant and his clients outweigh the risk of harm to plaintiff that might result from defendant's web site.

### IV. The Public Interest

Congress enacted the Lanham Act with the intent to eliminate unfair competition by prohibiting the use of deceptive or misleading marks in commerce. *See* 15 U.S.C. § 1127. In this case the record does not support plaintiff's claim of ownership in a protected mark, and the likelihood that defendant's mark will mislead or deceive consumers is low. For these reasons, the Court concludes that the important public policies enforced under the Lanham Act would not be served by granting a preliminary injunction in this case. The Court accordingly denies plaintiff's motion.

### ORDER

Based on the foregoing, and all of the files, records and proceedings herein, plaintiff's motion for a preliminary injunction [Docket No. 8] is **DENIED.**