KATHREINER'S MALZKAFFEE FABRIKEN MIT BESCHRAENKTER HAFTUNG et al. v. PASTOR KNEIPP MEDICINE CO.

(Circuit Court of Appeals, Seventh Circuit.    October 4, 1897.)

No. 393.

1. TRADE-MARKS—INFRINGEMENT—DECEPTION OF PUBLIC.
Where the name, portrait, and fac simile signature of another are employed without his consent and against his will, and are so assumed with a view to deceive the public into the belief that the product marketed and sold was prepared under his supervision, and offered to the public with his sanction, an injunction will be granted.

82 F.—21

2. SAME—HOW ACQUIRED—PERIOD OF USE.

It is not essential to a valid trade-mark that its use shall have been long continued, or that the article on which it is used should be widely known, or should have attained great reputation. It is sufficient if the article with the mark upon it has become actually a vendible article in the market, with intent by the proprietor to continue its production and sale.

3. SAME—BURDEN OF PROOF.

Where an alleged infringer in America, who used marks unquestionably belonging to another in foreign countries, claims to have anticipated him in the use of the mark in the American market, such alleged infringer should show with accuracy and detail the times of its earlier sales, and in the absence of such proof the court will not be overcritical in respect to the date of the first occupancy of the American market by the proprietor of the genuine article.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

A bill in equity was filed in the court below by the appellants, Kathreiner's Malzkaffee Fabriken mit Beschraenkter Haftung and Kneipp Malt-Food Company, complainants, against the Pastor Kneipp Medicine Company, the appellee, to restrain the use of certain trade-marks or trade-names, "Kneipp Malt Coffee," "Kneipp Coffee," and "Kneipp Malzkaffee," and to restrain the use of the picture and signature of Rev. Father Sebastian Kneipp in connection with malt coffee, either upon packages containing the goods, or in advertisements or announcements in relation thereto. The motion for the injunction was heard in the court below upon the bill and answer, and upon certain affidavits; and the motion for injunction was denied, and an appeal to this court taken from such ruling.

For some years prior to the year 1891, Sebastian Kneipp, a resident of Worishofen, Bavaria, and a priest of the Roman Catholic Church, and known throughout the continent of Europe as the "Reverend Father Kneipp," "Father Kneipp," "Pastor Kneipp," or "Pfarrer Kneipp," had interested himself in the subject of health, and had devised and formulated a system of dietetics, health preservatives, hygienic food, and sanatives, which he also had explained and expounded through addresses, lectures, pamphlets, and books written and published by him, and particularly through a book entitled "Meine Wasser Kur," published in 1886, and a book entitled "Thus Shalt Thou Live," published in 1889 (which latter work had passed through 19 German editions), both of which works had been translated and published in the English language, and extensively circulated in the United States of America, prior to the year 1891. Among other things, he deprecated the use of coffee, asserting it to be a deleterious beverage, and advocated as a substitute a drink prepared from roasted malt; stating that the malt must be roasted brown, and then finally ground and used like ordinary coffee. The use of malt as a substitute for coffee was not, however, original with Father Kneipp, but it had been in use for many years among the poorer classes of Europe. He also established in Bavaria a sanitarium where he put into practice his peculiar methods of treatment and of diet, and his name and works and sanitarium became known throughout the continent of Europe. His peculiar views with respect to the manner of living were widely adopted and practiced, and his sanitarium was resorted to from all parts of the continent, and by all classes of people seeking cure of their maladies. The firm of Franz Kathreiner Nachfolger, of Munich, with the knowledge and approval of Father Kneipp, and under his supervision, direction, and control, devised and employed certain formulas and processes for treating and preparing malted grain with a view to obtaining a cheap, wholesome, and nutritious food drink, and prepared a malt coffee possessing in considerable degree the aroma and taste of coffee, separating by some secret process the caffeone, which is the aromatic principle of coffee, from the caffein, its stimulating base, and infusing the roasted malt with the caffeone; so that, as it is claimed, the preparation is strengthening, healthful, and agreeable, retaining the aroma of coffee, but discarding its injurious properties. This firm placed this product upon the market with the knowledge, consent, and approval of the Reverend Sebastian Kneipp, and after submission to him, and obtaining his

approval of the methods, formulas, and processes employed in its preparation. The firm designated this product as "Kathreiner's Kneipp Malzkaffee." The firm obtained from Father Kneipp, for themselves, their successors and licensees, the right and privilege of so designating the product, and of the use of Father Kneipp's name in connection therewith, and the right to place upon each package the portrait and fac simile signature of Father Kneipp; he granting them the sole and exclusive right, license, and privilege so to do. So marked, identified, and approved by Father Kneipp, the product became widely and favorably known throughout the continent of Europe, and acquired a great reputation and sale. In 1892 the firm, with the approval of Father Kneipp, sold and transferred all rights and privileges with respect to the production and sale of the product, and the use of the trade-names and trade-marks mentioned, to a firm styled "Kathreiner's Malzkaffee Fabriken Wilhelm and Brougier," which thereafter continued the business under like conditions, and increased and extended the market for the product. In July, 1893, all rights were transferred to the appellant the Kathreiner Malzkaffee Fabriken mit Beschraenkter Haftung, a corporation then created, and which acquired all the rights and privileges of the former proprietors, with the consent and approval of the Reverend Sebastian Kneipp, and succeeded to the property, good will, processes, inventions, trade-marks, and trade-names used in connection with the product, and has since continued to own, control, conduct, and operate the business, and to manufacture and sell the product in wrappers or labels substantially identical with the former labels, but with its corporate name imposed thereon as the manufacturer, in lieu of the names of the former manufacturers when the product was sold in Germany, and, when sold in other countries, bearing words which are translations or equivalents of the German phrases employed, the word "Kneipp" being always included as a material and characteristic part of the label, and the packages always had thereon the portrait and fac simile signature of Father Sebastian Kneipp. The product has become widely known in many countries as "Kneipp Malt Coffee," and registration of the name "Kneipp," and of such picture and signature, in connection with malt coffee, has been allowed in the United States of America, England, Russia, Germany, France, Austria, Italy, Belgium, Holland, Denmark, Greece, Luxemburg, Norway, Sweden, Finland, Switzerland, Roumania, Servia, Canada, Argentine Republic, Brazil, South Australia, and the Cape of Good Hope. In 1891 the proprietors commenced to send this malt coffee, in packages so identified, to the United States. On September 12, 1891, a shipment was made to Seigfried Gruner & Co., of New York; on May 5, 1892, to Ignatz Fuhro, West Hoboken, N. J.; on November 23, 1892, to John A. Stocker, Detroit, Mich.; on February 3, 1893, to E. Lohnen, Sheboygan, Wis.; and on April 11, 1893, to Langler & Sons, New York, and to other persons. These shipments were made as forerunners to establish a demand and market therefor in the United States; and since October, 1891, this malt coffee has been continuously for sale in the United States in packages exhibiting the name, portrait, and fac simile signature of Sebastian Kneipp, the business developing in all countries with remarkable rapidity. No proceedings to register the trade-mark under the act of congress were had until 1894, although in 1891 an attorney was employed to procure such registration (which was not obtained until the year 1895), and for the name, portrait, and fac simile signature of Father Sebastian Kneipp. In 1893 the German proprietors, through their agent, entered into contract with Rein hart Rahr, of Manitowoc, Wis., for the manufacture and sale of malt coffee by this process in the United States and under the auspices of a contemplated American corporation. This resulted finally, in the spring of 1895, in a contract for the exclusive control of Kneipp malt coffee, under the stated trade-mark and trade-name, in the territory of the United States and Canada; and this contract, with the consent of all parties, was transferred to the Kneipp Malt-Food Company, one of the appellants, in December, 1895, which corporation has since that date succeeded to and conducted the business of manufacturing and selling malt coffee, under the trade-mark and trade-name stated, throughout the United States and Canada, in compliance with the method and process employed by the German proprietors.

In April, 1892, John Blocki and Edward Heller, of Chicago, who had for a short time theretofore conducted a drug business at Chicago under the name of John Blocki Drug Company, incorporated themselves, under the laws of

the state of Illinois, as Pastor Kneipp Medicine Company. In 1891 these men entertained the thought of entering upon the manufacture of some of the articles mentioned in the works of Father Kneipp, and Blocki had written to him of his intention, and asked for the terms of the secret formula of beneficial oil. He subsequently wrote. stating that it was proposed to use the name, picture, and signature of Father Kneipp as trade-marks. No reply was received from Father Kneipp directly to this letter, but Blocki received from a German lawyer a letter, addressed in behalf of Father Kneipp, refusing to permit it. Subsequently they formed the corporation stated, using the corporate name, Pastor Kneipp Medicine Company, and commenced the manufacture and sale of different medicines and articles recommended by Father Kneipp, and selling translations of the books written by him, and this without his consent or license. This corporation also manufacture and sell a malt coffee in packages labeled "Kneipp Coffee" and "Pf. Kneipp's Malzkaffee," and which contain the portrait, and the fac simile of the signature, of the Reverend Sebastian Kneipp, and upon which is stated that "Reverend Father Kneipp recommends this substitute for coffee to all persons of nervous temperament, impaired digestion, and children." Upon one side of the package is printed in large letters, both in English and in German text, "Do not Fail to Try Father Kneipp's Strength-Giving Food." The appellee also issued, by way of advertisement, and for display in stores where its product should be for sale, a large picture of Sebastian Kneipp, with the fac simile of his signature, and with the words printed thereon: "For Sale Here. Mgr. Seb. Kneipp's Medicines. Pastor Kneipp Medicine Co., Importers. Chicago." This preparation so sold is in fact made from Dakota malt, and by the appellee. It also issued circulars to the trade, stating, "Our malt coffee is prepared according to Reverend Father Kneipp's directions," and it is sold by "Pastor Kneipp Medicine Co., importers of Kneipp articles, Chicago. U. S. A. Every package has our trade-mark (Father Kneipp's portrait and signature)." On the 9th day of January, 1893, the appellee deposited in the office of the commissioner of patents, for registration, and on the 11th day of April, 1893, procured registration of, a trade-mark, the essential features of which are the portrait and fac simile signature of Rev. Sebastian Kneipp, the accompanying statement of the appellee being that "the class of merchandise to which this trade-mark is appropriated is medicine, and the peculiar description of goods comprised in such class is medicinal preparation of roots and herbs, to wit." Here follow a large number of well-known medicinal roots and herbs, and concluding with the following: "Cherry, valerian, violet, water mint, wild angelica, wormwood, Kneipp's laxative tonic, rhubarb pills, headache and fever powder, malt coffee, invigorating food." This statement is accompanied by the affidavit of the president of the corporation, stating, among other things, "that the said corporation has at this time a right to the use of the trade-mark therein described; that no other person, firm, or corporation has the right to such use, either in the identical form, or in any such near resemblance thereto as might be calculated to deceive." The evidence presented by the appellee left quite indefinite the date when it first commenced the manufacture and sale of malt coffee, although the general business of the corporation would seem to be the dealing in the articles recommended by Rev. Father Kneipp. There was evidence tending to show that at first the appellee imported the malt coffee prepared by the German proprietor, but afterwards prepared malt coffee from American malt, discovering that it could be produced in that way at a less price. The fact of such importation by the appellee of the malt coffee of the German proprietor was not denied.

Frank F. Reed, for appellants.

Louis K. Gillson, for appellee.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts as above). Upon the record, we are constrained to believe that the Pastor Kneipp Medicine Company, the appellee, was "conceived in sin and brought forth in iniquity," that wrong attended at its birth, and that fraud

stood sponsor at its christening, imposing upon the corporate child a name to which it was not entitled, and which it had no right to bear. The name of an eminent philanthropist was taken without his consent and against his protest. This assumption of name was a wrong which we cannot doubt a court of equity would, upon his application, have restrained, even if the purpose of the corporation had been wholly innocent and praiseworthy; but here, it is clear, the name, the portrait, and the fac simile signature of Rev. Sebastian Kneipp were employed, not only without his consent and against his will, but were so assumed with a view to deceive the public, and to induce the belief that the product marketed and sold was prepared under his supervision, and offered to the public with his sanction. Under such circumstances, equity will not hesitate to extend its preventive arm. Pillsbury v. Mills Co., 24 U. S. App. 395, 12 C. C. A. 432, and 64 Fed. 841. It is true that the Reverend Sebastian Kneipp is not a party to this suit, nor here complaining of the unauthorized use of his name. The appellants cannot therefore be heard in censure, unless they have acquired a right to the employment of this name, portrait, and fac simile signature in connection with the sale of malt coffee. If they have no property right therein, they have no standing in equity; but if they possess such property right, and it has been invaded, the wrong will be restrained. Without dispute, the present German proprietor, one of the appellants, has the exclusive right, so far as the Reverned Father Kneipp could grant it, to the use of his name, portrait, and fac simile signature in connection with the sale of malt coffee. It is clear, also, that its right to such exclusive use is sanctioned by the law of Germany, and of all other countries where the trade has been established. It is claimed that no such exclusive right exists in this country, for the reason that, as is asserted, at the time of the assumption of the particular designations complained of, no trade or established market for the goods existed in the United States, and that only sporadic importations are shown. It goes without saying that a trade-mark or trade-name can be acquired only by adoption accompanied with actual use. Whether user in one country confers the exclusive right to the use of the trade-mark or trade-name in another, as against a piratical use of it in such other country, we are not called upon to say. It would appear to have been so held in Collins Co. v. Oliver Ames & Sons Corp., 20 Blatchf. 542, 18 Fed. 561. The principle of that decision would seem to be that while the owner of a trade-mark may not be entitled to its exclusive use everywhere and under all circumstances, and may not enjoin its innocent use, yet where the public is, by the use of it, deceived and injured, equity will interpose, although the complainant may not have applied the trade-mark to the particular article, but to articles of the same class of merchandise. See, also, In re Munch, 50 Law T. (N. S.) 12; In re Riviere's Trade-Mark, 32 Wkly. Rep. 390; Paine v. Daniell & Sons' Breweries, 10 Rep. Pat. Cas. 217. It may be suggested whether, in these days of rapid and constant intercommunication and extended commerce between nations, any narrow line of demarkation should be established, on the one side of which should stand moral wrong with legal liability, and upon the other moral wrong with legal

immunity.    If, however, the courts of a particular government can, with respect to the subject in hand, take cognizance only of wrongs committed within the geographical boundaries of the country, it is still not necessary, in our judgment, that a trade in an article should be fully established, in the sense that the article be widely known, before the proprietor of its trade-mark or trade-name may be entitled to the protection of equity for the preservation of his rights. Otherwise it might be impossible, with respect to a valuable and desirable article or product of manufacture, designated by a particular brand or in a particular manner, ever to establish a trade.. Craft and cunning, discerning the value of the product, and the profit to be acquired, would, at the inception of the business, flood the market with spurious and cheaper articles or preparations of the similitude of the genuine, and strangle the trade in the genuine at its birth. It is enough, we think, if the article with the adopted brand upon it is actually a vendible article in the market, with intent by the proprietor to continue its production and sale.    It is not essential that its use has been long continued, or that the article should be widely known, or should have attained great reputation.    The wrong done by piracy of the trade-mark is the same in such case as in that of an article of high and general reputation, and of long-continued use.    The difference is but one of degree, and in the quantum of injury.    A proprietor is entitled to protection from the time of commencing the user of the trade-mark.    McAndrew v. Bassett, 4 De Gex, J. & S. 380; Jackson v. Napper, 4 Rep. Pat. Cas. 45; Cope v. Evans, L. R. 18 Eq. 138; Hall v. Barrows, 32 Law J. Ch. 548.    In the latter case it is well observed, in language which we do not hesitate to adopt:

"It has sometimes been supposed that a manufacturer can only acquire such a property in a trade-mark as will enable him to maintain an injunction against the piracy of it by others by means of long-continued use of it, or at least such a use of it as is sufficient to give it a reputation in the market where such goods are sold.   But I entertain great doubt as to the correctness of this view of the case.   The interference of a court of equity cannot depend on the length of time the manufacturer has user of it.   If the mark or brand be an old one, formerly used, but since discontinued, the former proprietor of the mark undoubtedly cannot retain such a property in it, or prevent others from using it; but provided it has been originally adopted by a manufacturer, and continuously and still used by him to denote his own goods when brought into the market and offered for sale, then, I apprehend, although the mark may not have been adopted a week, and may not have acquired any reputation in the market, his neighbor cannot use that mark.   Were it otherwise, and were the question to depend entirely on the time the mark had been used, or the reputation it had acquired, a very difficult, if not an insoluble, inquiry would have to be opened in every case, namely, whether the mark had acquired in the market a distinctive character, denoting the goods of the person who first used it.   The adoption of it by another is proof that he considers that at that time it is likely to become beneficial; and, if the 'manufacturer who first used it were not protected from the earliest moment, it is obvious that malicious and pertinacious rivals might prevent him from ever acquiring any distinctive mark or brand to denote his goods in the market by adopting his mark, however varied, immediately after its adoption or change by the original user of it."

The evidence here is satisfactory that the product in question was marketed in the United States first in the year 1891, and followed during the years 1892 and 1893 by other importations, not

numerous, indeed, but so many and in such quantities as one would look for during the first years of the growth of an infant industry, and indicating the intention of the proprietor to actively occupy the market. We are satisfied, also, that the appellee, at the outset of its enterprise, imported some of the genuine packages, and thereafter adopted and placed upon packages of its own manufacture the indicia pertaining to the genuine, and which no one but the parent company and its licensees had authority from the Reverend Sebastian Kneipp to employ, and which none other had the right to use. By reason of the circulation of the works of Pastor Kneipp in this country, faith in his theories of life and his remedies for the ills of life was growing, creating a good will in the sale of this malt coffee, thus authenticated with his name, picture, and fac simile signature, that was valuable to its owner. The date at which the appellee first undertook to impose upon the public its spurious article is left uncertain. Claiming to have anticipated the appellants in the American market, it should have, with accuracy and detail, exhibited the times of its sales. This has not been done. In the absence of such proof, we are not inclined to be overcritical with respect to the date of the first occupancy of the American market by the proprietor of the genuine article. We cannot but conclude that the appellee was not, as is claimed, the first to occupy the market, and that it sought to aggrandize to itself unlawfully, by the name assumed, and by the indicia placed upon its packages, the good will of a trade which belonged to another, and to deceive the public into the belief that its goods were the goods of the appellant foreign corporation, or its predecessors in right, prepared with the knowledge and under the sanction of the Reverend Sebastian Kneipp, and that it sought to create the impression in the public mind that it was the importer of the genuine article. Upon the whole record, we think it clear that the appellants were entitled to the equitable relief demanded. The order or decree appealed from is reversed, and the cause remanded to the court below, with directions to issue the writ of injunction as prayed for.