**LUCENT INFORMATION MANAGEMENT, INC.,**
Appellant,

v.

**LUCENT TECHNOLOGIES, INC.**

No. 98–7203.

United States Court of Appeals,
Third Circuit.

Argued May 25, 1999

Filed: Aug. 3, 1999

Lindsey H. Taylor, Friedman Siegelbaum, Roseland, NJ, Richard I. Samuel (argued), Cobrin, Gittes & Samuel, New York, New York, for Appellant.

Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Robert M. Newbury (argued), Mark V.B. Partridge, Bradley L. Cohn, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, IL, for Appellee.

Before: GREENBERG and ALITO, Circuit Judges, and ACKERMAN,* District Judge

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I. INTRODUCTION

This trademark case involves the question of what constitutes "use" sufficient to establish common law trademark rights. Lucent Information Management, Inc. ("LIM") argues that it had common law rights in the mark "LUCENT" prior to Lucent Technologies, Inc. ("LTI"), based on its usage of that mark before LTI filed an intent to use ("ITU") application with the United States Patent and Trademark Office ("PTO"), indicating its intention to use the mark LUCENT in commerce. LIM further alleges that LTI did not act in good faith in adopting and using the mark. We find that LIM's limited use of the mark did not constitute prior use in commerce sufficient to establish rights in the mark, and that, as a result, LTI's

* Honorable Harold A. Ackerman, Senior Judge of the United States District Court for the District of New Jersey, sitting by designation.

adoption and use of the mark did not constitute trademark infringement, and was in good faith as a matter of law.

## II. FACTUAL AND PROCEDURAL HISTORY

### A. LIM's Adoption and Use of the Name and Mark LUCENT

We accept as true the facts set forth by the district court, which drew all reasonable inferences in favor of LIM. In 1995 Norman Feinstein, Samuel Weinberg, Edward Eisen, and Cliff Armstrong formed LIM, a Pennsylvania corporation, to provide document imaging and management services, acting as a consultant on and reseller of software and hardware. LIM selected the name LUCENT during the summer of 1995 after finding it in a dictionary. Since its formation, LIM has operated out of the Bala Cynwyd, Pennsylvania, office of Feinstein's other business, Corporate Consultants, Inc., an employee benefits company. The four principals are LIM's only employees and Feinstein's employees at Corporate Consultants perform LIM's clerical and bookkeeping work. In the fall of 1995, LIM began using contacts and referrals to inform individuals and companies of its services. On September 5, 1995, Feinstein sent a one-page letter on Corporate Consultants' letterhead to about 50 people to announce the services LIM would offer. On October 5, 1995, Armstrong installed a modem for the Israel Bonds Office in Philadelphia. While Armstrong, not LIM, received the payment of $323.50 for the installation, the purchaser's invoice shows LIM's name and address, and viewed favorably to LIM, this transaction was its first sale.[1]

Through the end of 1995, LIM continued to seek clients from existing contacts and referrals. LIM did not do any public or paid advertising, relying instead on word of mouth and its solicitations of business from acquaintances of its principals. In November 1995, LIM made sales presentations to acquaintances at NBC in New York, Aramark in Pennsylvania, and Nixon Uniform in Delaware, but these presentations did not result in sales. From December 1, 1995, to February 5, 1996, LIM made about 12 presentations and continued to promote the new business with people the principals met socially and in business. The date of February 5, 1996, is significant because on that the date AT & T announced the creation of LTI to the public through a huge media campaign. On February 16, 1996, LIM made another sale, entering into a support agreement with a local bank. Finally, on April 29, 1996, LIM filed an application with the PTO to register LUCENT for computer and office-related services.[2]

### B. LTI's Adoption and Use of the Name and Mark LUCENT

LTI is the telecommunication and technology business spun-off from AT & T in 1996. A consultant suggested LUCENT as a potential name for the new business. Frank L. Politano, a trademark attorney, coordinated the trademark clearance. In November 1995, AT & T obtained a trademark name search and two trademark search reports, all of which located companies using the mark LUCENT or variants of it. One of the three search results included a reference to LIM.

On November 30, 1995, LTI through its predecessor in interest filed an intent to use application ("ITU") with the PTO for the mark LUCENT for various telecommunications and computer-related goods

---

1. On October 16, 1995, LIM met with Corporate Consultants to select products and services, and it then rendered services to it through November. The district court did not credit this as a sale because it involved services provided to Feinstein himself.

2. That application listed the first use of LUCENT as March 6, 1996; LIM amended the application after this suit was filed to claim the September 5, 1995 sale to the Israel Bonds Office as the date of first use.

and services.[3] When AT & T announced the spin-off on February 5, 1996, major newspapers and media covered the event. Many articles included LUCENT in the headline and LTI mailed out over 1.2 million announcements to potential customers. Like most of America, LIM learned about LTI in February 1996. On March 15, 1996, LIM's trademark counsel, John Caldwell, sent LTI a letter objecting to LTI's use of the name LUCENT, stating that LIM had adopted and used LUCENT on a "nationwide" basis. This cease-and-desist letter stated in part:

> In August and September, 1995, [LIM] began corresponding under the Lucent name. . . . This was a nationwide effort. . . . A copy of the letter sent at that time, with the addresses redacted, is enclosed. I also enclose a brochure available from [LIM] at that time. . . . I look forward to hearing from you with your assurance that a new name will be found for your company . . .

App. 289–90. Caldwell enclosed a copy of a promotional brochure and a letter to solicit clients on LIM letterhead dated September 5, 1995.[4]

On April 12, 1996, R.A. Ryan, AT & T's trademark counsel, responded to the March 15, 1996 letter, stating that she did not agree that LTI's use of the name "Lucent Technologies" created a likelihood of confusion, that the companies' markets did not overlap, and that their services and products are not confusingly similar. As we noted above, LIM thereafter filed an application to register the mark LUCENT. LIM's then-trademark counsel responded to the April 12, 1996 letter with a proposed agreement that each party would refrain from opposing the other parties' registration of the mark, and would use trade dress, advertising and marketing in a manner that would avoid likelihood of confusion. The parties, however, did not enter into that agreement. Shortly thereafter, LIM began this litigation.[5]

### C. *Procedural History*

LIM filed this suit on September 12, 1996, in the district court. LIM alleged that LTI infringed its trademark in violation of 15 U.S.C. § 1125(a), and alleged service mark and trade name infringement and unfair competition and deceptive trade practices under Delaware law (counts I–V). LIM sought injunctive relief, recovery of LTI's profits, and treble damages. LTI answered on October 3, 1996, denying infringement and raising several affirmative defenses, but generally admitting use of the name.[6]

On July 3, 1997, LTI moved for summary judgment as to counts I–V of the complaint, on the ground that LTI had prior rights to the name and mark LUCENT. The district court granted LTI's summary judgment motion as to counts I–

---

3. The Trademark Law Revision Act of 1988 added provisions allowing for registration of a mark on a showing that the applicant has a "bona fide intention . . . to use a trademark in commerce." 15 U.S.C. § 1051(b). Filing such an "intent-to-use" application establishes priority as of the date of filing (except as against those already using the mark), but a statement of actual use must be filed within 6 months, which may be extended to 24 months. 15 U.S.C. § 1051(d). At the same time the law was revised to provide that " 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.

4. Subsequently, LIM admitted that the letter had in fact been sent out on Corporate Consultants' letterhead. Significantly, the enclosed brochure did not in fact exist in September 1995, as LIM created it later.

5. LIM has filed five opposition proceedings arising out of LTI's application to file the LUCENT trademark with the United States Patent and Trademark Office which have been suspended pending the outcome of this appeal.

6. On May 14, 1997, LIM filed a supplemental complaint, alleging five additional claims for copyright infringement, tortious interference, trade libel, Lanham Act violations, and fraud (counts VI–X). The district court determined that those claims involved distinct issues from counts I–V.

V in an opinion and accompanying order dated November 5, 1997. *Lucent Info. Management v. Lucent Technologies, Inc.,* 986 F.Supp. 253 (D.Del.1997). While there were further proceedings in the district court, this appeal and thus the opinion concerns only those counts.[7] After the further proceedings LIM filed a timely appeal on April 17, 1998.

## III. STANDARD OF REVIEW

We review the district court's order granting summary judgment de novo, and we apply the same test the district court applied in the first instance. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1230 (3d Cir.1993). Consequently, we must determine whether the record, when viewed in the light most favorable to LIM, shows that "there is no genuine issue as to any material fact" and that LTI is "entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). We confine our discussion to the trademark infringement count as LIM has not briefed the case under state law.

## IV. DISCUSSION

### A. Trademark Infringement

Trademark law protects owners in the exclusive use of their marks when use by another is likely to cause confusion. *See A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 205 (3d Cir.1999) (en banc). Thus, to obtain relief a plaintiff in an infringement case must demonstrate its ownership of the mark. In considering who owns the mark LUCENT, the question before us is whether a reasonable trier of fact could find that LIM's activities prior to November 30, 1995, when LTI filed its ITU, established prior rights in the mark through use in commerce.

We consider events before November 30, 1995, because federal registration of a trademark is prima facie evidence of the mark's validity, the registrant's ownership of the mark, and its exclusive right to use the mark in commerce. 15 U.S.C. § 1115(a). Nevertheless, there are limitations on the right as section 7(c) of the Lanham Act states that "the filing of an application to register [a mark] shall ... confer[ ] a right of priority, nationwide in effect, ... against any other person except for a person ... who, prior to such filing, has used the mark." 15 U.S.C. § 1057(c). Consequently, the parties agree that LIM must establish rights in the name and mark LUCENT by its prior " 'use [of the mark] in commerce'—'use' being defined as 'the bona fide use of a mark in the ordinary course of trade....' " 15 U.S.C. § 1127.

It is a well-settled principle that a plaintiff must establish that it had prior rights or "priority" in the mark. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978) ("relief is only available if the plaintiff establishes priority"). Because LTI filed its ITU on November 30, 1995, LTI has priority over anyone using the mark after that date unless the person earlier used the mark. 15 U.S.C. §§ 1051(b), 1057(c). Accordingly, inasmuch as LIM does not assert prior registration, *see Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992), it can prevail only if it shows prior use of the mark "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Blue Bell, Inc. v. Farah Mfg. Co., Inc.,* 508 F.2d 1260, 1266 (5th Cir.1975).

LIM points out that this is a "reverse confusion" case, and contends that *Fisons Horticulture, Inc. v. Vigoro Indus.,*

---

7. LTI also moved for summary judgment on counts VI–X, and was granted summary judgment on March 24, 1998. *See Lucent Info. Management, Inc. v. Lucent Technologies, Inc.,* 5 F.Supp.2d 238 (D.Del.1998). Inasmuch as

LIM has briefed and argued only the dismissal of its original infringement claims, and not the dismissal of its supplemental claims, we address only the former.

*Inc.,* 30 F.3d 466 (3rd Cir.1994), controls the outcome. *See also A & H Sportswear,* 166 F.3d at 207. Reverse confusion exists when a junior user uses its size and market penetration to overwhelm the senior, but smaller, user. The "senior user" is the first to adopt and use a mark anywhere in the country. The "junior user" is the second user, regardless of whether it adopts and uses a mark in a geographically remote location. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26.01[1] (4th ed.1996). Reverse confusion doctrine protects the senior user's control of its mark and the goodwill created by the mark from a junior user's employment of the mark, and protects the public from being deceived into believing that the senior user's product emanates from, is connected to, or is sponsored by the junior user.

The facts in this case fit the reverse confusion model: LIM is the little start-up alleging that its identity and goodwill, built upon alleged use of a mark, have been threatened by LTI's swamping the market with the allegedly later use of the same mark. But, as LTI points out, LIM must show, as did the senior user in *Fisons,* that it is in fact the senior user. In *Fisons,* the senior user was the uncontested owner of the registered mark in dispute, so there was no need for it to establish rights through prior use. *Fisons,* 30 F.3d at 469. Thus, in that case we were able to proceed to a likelihood-of-confusion analysis. But we cannot apply the senior user versus junior user analysis of *Fisons* unless and until we determine that there are two "users" of the same mark. Because the record cannot support that finding, we do not undertake a likelihood-of-confusion analysis.

We measure "use" by the four-factor test of *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1398–99 (3d Cir.1985). That case represented and is clearly applicable to the commonly recurring fact pattern of concurrent use of confusingly similar common-law trademarks in different regions. Here, we do not have geographic competition, with a senior user allegedly being established in an area, and a junior user moving in on that territory or trying to use the same mark in another region. From its outset LTI was willing and able to operate nationwide, and has undisputed national market penetration.[8]

The facts before us vary from the classic geographic extent of use cases. However, we may assess the basic issue—market penetration based upon prior use of the mark—applying the *Natural Footwear* test, which, like similar tests in other circuits, measures the extent of a senior user's actual use and zone of expansion. *See, e.g., Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc.,* 62 F.3d 690, 693 (5th Cir.1995) (examining whether the defendant had established a market presence or market penetration in any specific locality as of the date of registration of plaintiff's mark and noting that the market area is frozen at the time of the registration by the senior user).[9]

A party asserting trademark ownership in a trading area must show "clear entitle[ment]" to protection of its trademark in a particular market. *See*

**8.** LIM cannot show national sales penetration or recognition of its mark, but appears to argue that there is a natural zone of expansion for its services—the entire nation—for it eventually could reach customers nationwide and hoped to do so. We need not reach the issue of calculating its zone of expansion as its commercial use of LUCENT has not been established even in a small area. *See, e.g., ACCU Personnel, Inc. v. AccuStaff, Inc.,* 846 F.Supp. 1191, 1208–09 (D.Del.1994) (refusing to find zone of natural expansion in parts of Pennsylvania and Delaware from plaintiff's usage area in southern New Jersey).

**9.** We note that a district court has used the *Natural Footwear* test to assess market penetration in a situation involving overlapping but not distinct geographic sales regions. *See Smith v. Ames Dep't Stores, Inc.,* 988 F.Supp. 827, 837–39 (D.N.J.1997), *aff'd,* 172 F.3d 860 (3d Cir.1998) (table).

*Natural Footwear,* 760 F.2d at 1397. In other words, that party must introduce evidence to show its trademark "has achieved market penetration that is 'significant enough to pose the real likelihood of confusion among the consumers in that area.' " *Id.* (quoting *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 929 (8th Cir.1967)). *Natural Footwear* adopted a four-factor test "to determine whether the market penetration of a trademark in an area is sufficient to warrant protection: (1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *Natural Footwear,* 760 F.2d 1383, 1398–99 (internal citations omitted).

■ Applying this test, we reach the same result as did the district court in granting LTI's motion for summary judgment. LIM's "volume of sales" in 1995 consisted of Armstrong's single sale for $323.50. This court has held that sales volume must be more than *de minimis.* "When sales activity does not exceed even a minimum threshold level, a court may properly conclude that market penetration ... simply has not been demonstrated." *Id.* at 1400 (finding *de minimis* clothing sales of less than $5,000 and total of over 50 customers in at least two of the three years for which sales data were available). LIM asks us to consider *Blue Bell,* 508 F.2d at 1265, in which the Court of Appeals for the Fifth Circuit held that "even a single use in trade may sustain trademark rights if followed by continuous commercial utilization." Here, though, if we look for "continuous commercial utilization" beyond the first sale, as required under *Blue Bell,* we do not find that the continuous use—the further promotional efforts—"sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Id.* at 1266.

Because LIM made only a single sale in the period before LTI filed its ITU, we cannot find and review "growth trends," the second factor in the *Natural Footwear* test. LIM has argued that it had the potential and intention to offer services to a nationwide market, but even considering the volume of potential clients in the Philadelphia area, we must conclude that the ratio of existing customers to potential customers is minute.

As for the fourth and final factor, advertising and promotion, LIM stresses that its efforts were not to reach the general public at first, but rather to cultivate its clientele from existing contacts. LIM does not assert that its advertising and promotion to the public were extensive in any region, let alone nationwide. We may take into account in this respect and more generally the nature of the market LIM has entered and the services it offers. LIM contends that as a start-up company with a limited budget, offering relatively expensive services which are not "sampled" easily by customers, it would be expected to take time for it to win over clients. Accordingly, it is understandable that it would try to establish the business through a small circle of existing business and personal contacts. LIM correctly notes that sales or presentations made to acquaintances or friends may be bona fide commercial uses. *But see Jaffe v. Simon & Schuster Inc.,* 1987 WL 124312, 3 U.S.P.Q.2d 1047, 1049 (S.D.N.Y.1987) ("A [trademark] user's early sales to friends and relatives do not 'actually put the product on the market ....' ") (citation omitted).

But the fact remains that LIM existed for only about three months before LTI filed its ITU, had made but one sale in that period, had not invested any monies in public advertising or expanded beyond its initial set-up, and had made a relatively small number of sales presentations. LIM offers evidence of confusion generated by LTI's launch, such as phone calls intended for LTI coming to its office or people wondering whether it stole the mark from

LTI. Nevertheless, LTI is correct when it stresses that LIM wants to protect its intention to create goodwill and a successful business, and not the goodwill and business itself. Certainly any new business will need time to get off the ground, but the courts cannot aid that effort by awarding trademark rights in an unregistered mark that the business hopes or anticipates will be used but has not been used. Thus, we agree with the district court that LTI has prior rights in LUCENT because it filed its ITU on November 30, 1995, and LIM has not shown prior use.

### B. *LTI's Good Faith Adoption and Use of the Mark LUCENT*

LIM argues that LTI is liable for bad faith because it was aware of LIM's existence and/or use of the mark, but proceeded to adopt it anyway.[10] The issue is moot because LIM was not a senior user for the above reasons. *See Zazu Designs,* 979 F.2d at 504–05.

In any case, the only evidence LIM has raised as to whether there was bad faith is LTI's assertion of privilege during discovery as to what steps, if any, LTI took upon generating the trademark search which included the reference to LIM. In this context, we will not draw an adverse inference from the raising of privilege, as courts have found that reliance on the advice of counsel after conducting a trademark search is sufficient to defeat an inference of bad faith. *See Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,* 1983 WL 51933, 220 U.S.P.Q. 609, 612 (D.Mass.1983). Thus, while we have not decided whether a junior user's knowledge of the senior user's use of a mark is sufficient to attribute bad faith adoption of the mark, we see no reason to do so on this occasion. *See A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 n. 7 (3d Cir.1986) ("[t]hose claims raise interesting issues" not necessary for decision).

### V. CONCLUSION

For the foregoing reasons, we will affirm the district court's order of November 5, 1997, granting LTI's motion for summary judgment on counts I–V in the original complaint, dismissing LIM's trademark infringement and related claims.

ACKERMAN, Senior District Court Judge, dissenting.

I respectfully dissent from the opinion of my learned colleagues. I agree that the majority has correctly identified the issue in this case, *i.e.,* what constitutes "use" sufficient to establish a common law trademark. Because, however, I believe there are genuine issues of material fact which preclude entry of summary judgment on this record, I would reverse the summary judgment of the district court. I write also to clarify the process by which district courts should resolve common law trademark disputes.

LTI moved for summary judgment of Counts I through V of LIM's September 12, 1996 Complaint. In those counts, LIM alleges violations of section 43(a) of the Lanham Act and common law trademark infringement. To establish a claim of common law trademark infringement, one must prove (1) it is the owner in the relevant area of a mark that is distinctive and protectable, and (2) that the defendant's actions cause a likelihood of confu-

---

10. Applying the test in *Fisons,* we would consider whether LTI was "careless" in searching for uses of the mark. *Fisons,* 30 F.3d at 480. In *Fisons* we suggested, substituting the parties here for those in that case, that "[t]he questions the district court should consider here are whether [LTI] conducted an adequate name search for other companies marketing similar goods under trademarks including the name[LUCENT], and whether it followed through with its investigation when it found there were such companies. Did [LTI] consider the likelihood of confusion with other companies' marks and products (as opposed to considering the likelihood that someone would contest its new mark)? Did it attempt to contact companies using a similar mark, such as[LIM]? Was [LTI] careless in its evaluation of the likelihood of confusion?" *Id.*

sion. *See e.g., Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 291 (3d Cir.1991). The elements of a section 43(a) violation are similar. *See Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 582 (2d Cir.1993).

The primary issue in this appeal is whether LIM has used the "LUCENT" mark in a manner sufficient to confer ownership rights. In granting summary judgment to LTI in this case, the district court determined that no trier of fact could find that LIM had "used" the "LUCENT" mark to a degree sufficient to obtain common law trademark rights. In addressing that issue, the district court first looked to the standard of "use" traditionally applied to common law trademarks and then looked to the standards set forth in *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1398–99 (3d Cir. 1985). While I agree with the former approach, I do not agree with the latter. Thus, I also disagree with the majority's exclusive reliance on the test set forth in *Natural Footwear* to determine the threshold issue of use sufficient to obtain a common law trademark.

### A. *Standard of "Use" under Common Law Trademark Law*

It is a well-established principle of trademark law that the exclusive right to a distinctive mark belongs to the party which first uses the mark in connection with its particular line of business. *McLean v. Fleming,* 96 U.S. (6 Otto) 245, 24 L.Ed. 828 (1877); *Ford Motor Co.,* 930 F.2d at 292. This first actual use in commerce, however, must be "deliberate and continuous, not sporadic, casual or transitory." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1272 (2d Cir.1974) (Friendly, Cir. J.). Indeed, the right to use a mark exclusively is akin to a monopoly which derives from "its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." *Id.* It is axiomatic that if there is "no trade—no trademark." *Id.* at 1274.

The Lanham Act provides that "use" is "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark ... a mark shall be deemed to be in use in commerce ... on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127. Although this standard of use applies to the amount of use required to achieve statutory trademark rights and may be lower than the "use" needed to obtain a common law trademark, *see Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503–04 (7th Cir.1992), that standard is instructive with respect to common law trademarks. *See, Zazu Designs,* 979 F.2d at 509 (Cudahy, Cir. J., dissenting); *Societe de Developments Et D'Innovations des Marches Agricoles et Alimentaires–Sodima–Union de Cooperatives Agricoles v. International Yogurt Co., Inc.,* 662 F.Supp. 839, 853 (D.Or.1987) (noting that "use in commerce required for obtaining a federal registration is generally congruous with the required use of a mark for obtaining ownership under the common law.").

Traditionally, ownership of a trademark accrues when goods bearing the mark are "sold, displayed for sale or otherwise publicly distributed." *Blue Bell v. Farah Manufacturing Co., Inc.,* 508 F.2d 1260, 1265 (5th Cir.1975). Indeed, to establish prior use for a common law mark, distribution of the mark need not be wide-spread, but it must be of a public nature and more than de minimis. *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.,* 146 F.3d 350 (6th Cir.1998); *Kathreiner's Malzkaffee Fabriken Mit Beschraenkter Haftung v. Pastor Kneipp Medicine Co.,* 82 F. 321 (7th Cir.1897) (common law rights obtained by foreign company which had sent five test shipments to companies and individuals in the

United States). Actual sales are not necessary to establish prior use and extensive advertising alone may in some cases be sufficient to establish a common law trademark right. *See WarnerVision Entertainment Inc. v. Empire of Carolina Inc.*, 915 F.Supp. 639, 645 (S.D.N.Y.), *aff'd in part and rev'd in part*, 101 F.3d 259 (2d Cir. 1996).

The Sixth Circuit's recent decision in *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350 (6th Cir.1998) is instructive on the application of the common law standard of "use." In *Allard*, the defendants began using the contested mark in 1989 in connection with its employee placement business. Defendants were not very successful and had no revenue prior to the relevant date, March 1994. Beginning in 1991, however, the defendants engaged in individualized attempts to place employees at large companies and contacted several large companies to inform them of its business. In 1993 and 1994, the defendants tried to place several employees with large companies with little success. In this regard, defendants sent a fax with two resumes to the company Lane Bryant. Defendants also sent a promotional mailing to 100 potential customers on March 30, 1994.

The Court of Appeals, affirmed the district court's conclusion that defendants' conduct prior to March 1994, though not extensive or profitable, was sufficiently public to warrant common law trademark rights. The Sixth Circuit held that "[a]s long as there is *a* genuine use of the mark in commerce, . . ., ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition." *Id.* at 358 (emphasis added). Relying on the Fifth Circuit's opinion in *Blue Bell*, the court went on to hold that "such use need not have gained wide public recognition, and even a single use in trade may sustain trademark rights if followed by continuous commercial utilization." *Id.* (internal citations omitted); *see Blue Bell*, 508 F.2d at 1265.

Ultimately the Court of Appeals based its conclusion that the defendants had "used" the mark sufficiently on (a) defendants' attempt to complete genuine commercial transactions, (b) the commercial nature of their attempts which need not have "achieved wide public recognition" of the mark and (c) the consistent and continuous, though not high-volume, use of the mark. The court relied specifically upon the fact that the defendants had used the mark "on at least one fax, on at least one resume, and in numerous [oral] solicitations." *Allard*, 146 F.3d at 359. The court further determined that although defendant's word-of-mouth advertisement campaign might not be preferred "it is not so atypical that no reasonable person could view it as 'commercial.'" *Id.* at 358. The Sixth Circuit remanded the case for a finding of the area in which the defendants had continuously used their mark prior to plaintiff's registration.

Given the aforementioned standard of "use" applicable to a common law trademark, as exemplified in *Allard*, there are on this record genuine issues of material fact which preclude entry of judgment in favor of LTI. Here, a trier of fact may conclude that LIM had used the "LUCENT" mark sufficiently to obtain common law trademark rights. Specifically, LIM had not lain dormant prior to November 30, 1995. Rather, in August and September of 1995, soon after its inception, LIM began its marketing efforts. At that time, LIM hired a graphic designer to develop a logo, letterhead, business cards and other assorted documents such as messages, message pads, labels and brochures. LIM's marketing materials included a folder holding documents from manufacturers and software producers containing labels which identified LIM as the source of the products.

On September 5, 1995, Mr. Feinstein, one of LIM's principals, wrote a letter on the letterhead of another of his companies,

Corporate Consultants, which introduced LIM, by name, and the services it provided. The letter was sent to between approximately 25–50 people: clients of Corporate Consultants and other contacts Mr. Feinstein viewed as potential customers. That letter referred to the services LIM was providing and specifically associated the "LUCENT" mark with those services; "The name Lucent was selected after extensive study and with various database searches. It is a derivation of translucent and well describes our mission of providing light, clarity, and guidance in a new and exciting field." (Sept. 5, 1995 Letter).

Beginning in October 1995, LIM entered into several distributorship agreements with hardware and software companies which authorized it to resell those companies' products. For example, in October 1995 LIM entered into a contract permitting LIM to resell File Magic software, as well as a contract with Tech Data. LIM's principals also attended an exposition in October 1995, sponsored by Imaging World Magazine, at which LIM was registered by its name and the attending LIM principals wore badges that bore the company name.

In November 1995, LIM received its business cards and letterhead from the printers and LIM's principals began distributing extensively their business cards, bearing the "LUCENT" mark, as a means of advertisement. In the Fall of 1995, LIM also directed its marketing efforts at prospects through personal solicitations via mail, phone and personal meetings. LIM, however, did not engaged in any public or paid advertising but its employees discussed business with virtually everyone they came in contact with.

Ultimately, LIM made sales presentations to three companies prior to November 30, 1995, the date on which LTI filed

its Intent to Use the "LUCENT" mark. The present records establish that on November 3, 1995 LIM made a presentation to ARAMARK in Philadelphia, on November 17, 1995 LIM made a presentation to NBC in New York, on November 21, 1995 LIM made its first of several presentations to Nixon Uniform in Delaware. Although LIM's initial contact with Nixon Uniform was through a personal friend, the solicitation letter and LIM's presentation was made to another Nixon Uniform employee with whom LIM had no prior connection.

Although LIM used various marketing techniques, it made only two sales prior to December 1, 1995. Specifically, on October 5, 1995 for $323.50 LIM installed a modem for the Israel Bonds Office in Philadelphia and provided related training. LIM's contact at the Israel Bonds Office was a friend of one of LIM's principals. LIM provided the Israel Bonds Office with an invoice on a pre-printed LIM form though payment was directed to Mr. Armstrong, one of LIM's principals. In addition to LIM's sale to the Israel Bonds Office, on October 17, 1995 LIM took an order from Corporate Consultants, Mr. Feinstein's company with whom LIM shared office space. The services rendered to Corporate Consultants included: network servers, network fax software, SCSI cards, scanners, and other peripherals as well as consultation services on the design of their document imaging system beginning on November 12, 1995.[1]

At the summary judgment stage, a court may not weigh the evidence or make credibility determinations—these tasks are left to the fact-finder. *Petruzzi's IGA v. Darling–Delaware*, 998 F.2d 1224, 1230 (3d Cir.1993). I am also mindful that summary judgment motions in this area of the law should be analyzed carefully because

[1] The district court did not credit LIM for this sale to Corporate Consultants because the court considered this to be an internal transaction which did not bear on the determination of whether LIM had established priority. Since the record has not been fully developed on this point, and I resolve all reasonable inferences in favor of LIM, I credit this sale, at this time, to LIM. On a fuller record, the trier of fact can determine whether this sale was sufficiently public to weigh in favor of LIM's ownership rights.

the disposition of trademark disputes are factually driven, *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978) and the "right granted to the owner of a registered trademark is a monopoly and should not be extended unless the owner is clearly entitled thereto," *S.C. Johnson & Son, Inc. v. Johnson*, 266 F.2d 129, 136 (6th Cir.), *cert. denied*, 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d 65 (1959).

Here, the court's grant of summary judgment to LTI grants LTI a monopoly to use the "LUCENT" mark without proof that it is clearly entitled to it. LIM's conduct prior to November 30, 1995 provides a basis upon which a trier of fact may determine that LIM had "used" the "LUCENT" mark to the degree necessary to show priority of use and ownership. Only a trier of fact making credibility determinations upon a fuller record can ultimately determine whether LIM's intentional and continuous marketing strategy, three sales presentations, participation in a trade show, distributorship contracts and sales were sufficient to establish a common law trademark right. Though there are facts in the record which detract from LIM's early uses, such as LIM's statement in its trademark application that its first sale was in 1996, weighing such evidence is inappropriate at this time. A trier of fact may ultimately weigh this against LIM and conclude that its prior sales were not public enough to achieve a common law trademark. This is not for the court to decide on summary judgment.

The district court's summary conclusion that "the letters and presentations were not extensive enough to satisfy the standard of 'popularization in the public mind,'" relied too heavily on the often-quoted excerpt from *Blue Bell* that "use" must be "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Blue Bell*, 508 F.2d at 1266. A closer reading of that case, however, reveals that Farah, which was ultimately awarded ownership of the

"Time Out" mark as well as an injunction against Blue Bell, had not obtained any market penetration through its first shipment to customers. Rather, that first shipment upon which Farah's trademark rights rested, was merely the first "point at which the public had a chance to associate Time Out with a particular line of sportswear." *Id.* at 1267. By relying too heavily on that passage in *Blue Bell*, the district court expected more market penetration than is needed to become the owner of a trademark. Historically, as discussed above, the use required for a common law mark need not be extensive and need not "result in deep market penetration or widespread recognition." *Allard Enterprises, Inc.*, 146 F.3d at 358.

The district court also prematurely discounted LIM's sale to Israel Bonds as being a sale to a friend or relative. Here, although LIM's contact at the Israel Bonds office was a friend of its principals, a trier of fact may still find that this was sufficiently public based upon a fuller record regarding the nature of the sale, the future servicing and training LIM agreed to provide for Israel Bonds and other facts relevant to the sale. The district court also unduly minimized the significance of LIM's promotional letters introducing LIM to potential clients as well as its word-of-mouth sales campaign. Although LIM's initial promotional efforts were based on word-of-mouth promotions and direct mailings to business associates, this does not necessarily diminish their significance. In this case, the recipients of LIM's September 5, 1995 letter were not merely social friends who did not have any market presence. Rather, it appears from the present record that those 25–50 people were chosen from existing corporate customer lists which represented a list of potential customers. The *Allard* court properly held that reliance of a word-of-mouth campaign or business contacts which could result in bona fide sales was not "so atypical that no reasonable person

could view it as 'commercial.' " *Id.* at 358. Such is the case here.[2]

Thus, because I find that there is a genuine issue of material fact as to whether LIM's conduct establishes "use," I would remand for further proceedings.[3]

### B. *The Natural Footwear Test*

With respect to the district court's secondary reliance on the four-factor test announced in *Natural Footwear* to determine "use" and the majority's exclusive reliance on that test, I also dissent. Although the *Natural Footwear* test is useful at the remedy stage of a proceeding to determine the territorial limits of an injunction to delineate trademark rights between two remote users of a confusingly similar mark, that test is inapplicable to the threshold question of ownership. While I am mindful of the precedential value of *Natural Footwear*, I am also mindful that *Natural Footwear* does not stand alone as the governing principle of trademark law, and in this case, stands apart from the requisite threshold inquiry for a common law trademark.

I will not recount here the facts of *Natural Footwear*, suffice it to say that the court was presented with a dispute arising out of the territorial limits of a senior user's mark when a junior user had cultivated the same mark in a geographically remote market. Presented with the need to formulate a test which would address the scope of a common law trademark right, this court announced a four-part test for determining the market penetration of a trademark in a specific area. That test measures "(1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *Natural Footwear Ltd.*, 760 F.2d 1383, 1398 (3d Cir.1985) (internal citations omitted). The purpose of this test is to ensure that a common law trademark holder's rights do not precede it into a market it has not yet penetrated but which a subsequent user has penetrated.

There is no indication in the history or subsequent application of that four-factor test that it was intended to be used to discern the status of a prior user as an initial matter. Rather, the history and later reliance on the *Natural Footwear* test supports the conclusion that this test is a tool of equity designed to determine the appropriate remedy in a geographical dispute between two good faith users of a mark. In fact, one must remember that the *Natural Footwear* test is an exception to the well-established rule of law that a senior user is deemed the exclusive owner of the trademark. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 101, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415–16, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916). This exception grew out of the need to balance the equities between two good faith remote users of the same mark. *Id.*; *ACCU Personnel, Inc.*, 846 F.Supp. at 1213 (D.Del.1994) (noting exception to rule

---

**2.** Surely the district court did not intend to conclude that a company's targeting existing corporate clients or "friends in high places" for its promotions and initial sales cannot form the basis for a common law trademark right. Such a holding would have tragic consequences to all companies, particularly large companies, which have cultivated substantial business and social contacts with potential clients. In fact, this is how business has been done for millennia.

**3.** Although summary judgment is not appropriate here, it is still appropriate where a

company merely reserves a mark to preclude competition or for later use, *see La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1272, where a company makes a token sale to lay down a claim to the mark, *see Talk To Me Products, Inc. v. Larami Corp.*, 804 F.Supp. 555 (S.D.N.Y.1992), or made internal, secret sales, *Hydro–Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470 (Fed.Cir.1987), or merely made sales to personal friends who were not market players, *see Jaffe v. Simon & Schuster*, 3 U.S.P.Q.2d 1047, 1049 (S.D.N.Y. 1987).

of priority). The analysis in *Sweetarts v. Sunline, Inc.,* 380 F.2d 923 (8th Cir.1967), one of the decisions upon which the *Natural Footwear* court relied, illustrates this point. In *Sweetarts,* after the Eighth Circuit found that the plaintiff had a valid common law trademark which the defendant had infringed, the court turned to the question of the "geographical extent to which plaintiff is entitled to relief." *Id.* at 928; *see also Weiner King, Inc. v. The Wiener King Corp.,* 615 F.2d 512 (CCPA 1980) (territorial inquiry made only after each user's rights established).

Even within this circuit, it was only recently in *Smith v. Ames Department Stores, Inc.,* 988 F.Supp. 827 (D.N.J.1997), *aff'd,* 172 F.3d 860 (3d Cir.1998), which is not precedential authority, and the instant case, that the *Natural Footwear* test was applied exclusively to the threshold inquiry of use. Prior to those recent cases, the *Natural Footwear* test was applied only to the question of the territorial limits of an injunction between two remote users. *See e.g., Ford Motor Co.,* 930 F.2d 277 (discussing the acquisition of a common law trademark without reference to *Natural Footwear*); *ACCU Personnel, Inc.,* 846 F.Supp. 1191 (*Natural Footwear* test applied to determine extent of common law trademark rights already secured in Southern New Jersey); *Trans Pacific Insurance Co. v. Trans–Pacific Insurance Co.,* 739 F.Supp. 240 (E.D.Pa.1990) (preliminary injunction denied to "senior common law mark user" under the *Natural Footwear* test absent proof of actual market penetration); *City of Newark v. Beasley,* 883 F.Supp. 3, 9 (D.N.J.1995) (stating that "there is no set formula as to the quantity of use required to establish mark rights. The general rule is that mark rights are not created by sporadic or de minimis use.").

Moreover, in the Eighth Circuit in which *Sweetarts* is the law, that test is not applied to the threshold inquiry of use but is applied when considering the scope of the remedy given to a senior common law

trademark user in a territorial dispute. *See Wrist–Rocket Manufacturing Co., Inc. v. Saunders Archery Co.,* 578 F.2d 727, 732 (8th Cir.1978) (relying on *Sweetarts* only for geographical zone of common law rights and not "use" analysis); *Electronic Communications, Inc. v. Electronic Components for Industry Co.,* 443 F.2d 487 (8th Cir.1971) (on question of prior use, the Eighth Circuit looked to actual use in commerce but did not invoke the *Sweetarts* standard of inquiry); *Graham Webb International v. Helene Curtis Inc.,* 17 F.Supp.2d 919 (D.Minn.1998) (issue of prior use between plaintiff's initial sale of goods compared to defendant's promotional and test efforts addressed with traditional common law principles and no reference to *Sweetarts* ).

It is plain from a review of these cases that the *Natural Footwear* test is an exception which grew out of the need to balance the equities between two remote users of the same mark where the remedy imposed is a permanent injunction. This test was not meant to be dispositive of the ownership of a mark between two concurrent users and stands in stark contrast to the standard relied upon by Judge Friendly in *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, that "there must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade." *Id.* at 1274 (*quoting Clairol, Inc. v. Holland Hall Products, Inc.,* 165 U.S.P.Q. 214 (TTAB 1970)).

By applying to the threshold question of use for a common law mark the same standard of "use" required for a permanent injunctive relief, I respectfully suggest that the majority errs. The distribution of trademark rights is distinct from the question of appropriate remedy. This is especially true in trademark disputes where courts have great latitude to "tailor trademark remedies to decrease the likelihood of confusion without unnecessarily inhibiting competition." *Merchant & Evans, Inc. v. Roosevelt Building Products*

*Co., Inc.,* 963 F.2d 628, 639–40 (3d Cir. 1992). A permanent injunction is, of course, not the only form of equitable relief in a court's arsenal. *See* Kane, Siegrun, *Trademark Law: A Practioner's Guide,* (3d Ed.1997) at 16–1—16–7; 15 U.S.C. § 1116(a) (courts "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable.") Given the range of remedies available to an infringed party, there is no sound reason for equating the standard of use to obtain a trademark with the standard needed to obtain an injunction against a remote user.

In practice, this higher standard of use would deprive local start-up concerns in this circuit from obtaining common law trademark rights based upon their deliberate and continuous use of a mark. Indeed, such a test might make it "impossible, with respect to a valuable and desirable article or product of manufacture, designated by a particular brand or in a particular manner, ever to establish a trade," *Kathreiner's Malzkaffee Fabriken Mit Beschraenkter Haftung,* 82 F. at 326. Simply, a company's attempts to establish a business with the aid of a trademark could be stifled by a competitor before that company's sales and "market penetration" ever reach the standard set forth in *Natural Footwear.* I do not believe this is what was intended under trademark law or under the Lanham Act. Indeed, the majority's formulaic adherence to *Natural Footwear* proceeds on the theory that a trademark must penetrate a particular geographic area in its inception rather than recognizing that a prior senior user is entitled to ownership of a mark in its development into a larger concern provided that its initial use is enough to grant it ownership rights.

Putting aside for a moment the impact the majority's rule of use may have for start-up companies which are slow to achieve market penetration, one can easily foresee how this new rule may also present problems to long-established companies. The rule adopted by the majority means that trademark users which have engaged in continuous use of their mark albeit over a diffuse area will no longer have *any* trademark rights. By refusing all common law trademark rights to a long-standing, non-concentrated and moderately successful company under the *Natural Footwear* test, a junior user can enjoin that company from using a mark altogether. Such a result runs counter to trademark law.

In this global economy where goods are often sold over a wide area rather than in a neighborhood store, the majority's rule of use penalizes small companies which take advantage of the national market. It is ironic that the majority sets forth such a high standard of use in this day and age when there is a technological revolution underway in which the internet permits small trademark users to sell their goods and services to broad geographic areas. The majority's standard of use places a legal straightjacket on those companies and deprives them of all common law trademark rights. In the end, this will exclude a whole class of trademark users from obtaining rights through "use" rather than registration and will tilt the level playing field which has always been an indispensable ingredient in deciding trademark rights.

The sounder analysis, I respectfully suggest, is to determine first whether a company has engaged in sufficient use of a mark under common law trademark law and, if there is a finding of infringement by another company, the court should consider that first company's market penetration and other indicia of the equities involved in the case to fashion appropriate injunctive relief. *See Allard Enterprises, Inc.,* 146 F.3d 350 (diffuse use created common law rights but case remanded for a determination of what area the defendants had penetrated before granting an injunction); *Soltex Polymer Corp. v. Fortex Industries, Inc.,* 832 F.2d 1325 (2d Cir.1987) (where confusion was moderate, disclaimer was appropriate remedy); *N. Hess' Sons, Inc.*

*v. Hess Apparel, Inc.,* 738 F.2d 1412 (4th Cir.1984) (disclaimer relief granted); *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.,* 627 F.2d 628 (2d Cir.1980) (where equities were close, no permanent injunction granted); *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.,* 967 F.Supp. 1457 (E.D.Pa.1997) (disclaimer granted); *remanded on other grounds,* 166 F.3d 197 (1999); *WAWA Inc. v. Commons at WAWA, Inc.,* 1989 WL 101362 (E.D.Pa. 1989) (disclaimer granted instead of permanent injunction where likelihood of confusion was minimal); *Thrifty Rent–A–Car System, Inc. v. Thrift Cars, Inc.,* 639 F.Supp. 750 (D.Mass.1986) (recognizing common law senior user but defining market as East Taunton, Massachusetts and fashioning appropriately narrow injunctive relief).

For the foregoing reasons, I dissent from the majority's decision today to raise the "use" requirement for a common law trademark right to the same level needed to obtain a permanent injunction between two remote users.

## C. *LTI's Good Faith Adoption and Use of the "LUCENT" Mark*

As stated by the majority, the court need not determine in this case whether knowledge of a senior user's mark is dispositive of a junior user's bad faith in adopting that mark. Here, since the district court determined that LIM had no trademark rights, logically, the district court did not fully address the issue of LTI's bad faith or its assertion of the attorney client privilege during discovery. As stated above, I disagree with the district court's grant of summary judgment and I would remand this case for further proceedings including a determination of whether LTI may assert the attorney client privilege in this case.